**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3616-22
                      A-3927-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MARCUS O. MORRISEY,
a/k/a MARUS MORRISEY,
MARCUS KING, MARUS
O. MORRISEY, KEITH GRAY,
and MARCUS MORRISSEY,

     Defendant-Appellant.

_____

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DANRON T. MORRISEY,

     Defendant-Appellant.

_____

        Argued (A-3616-22) and Submitted (A-3927-22)
        April 9, 2025 – Decided May 23, 2025

Before Judges Mayer, Rose and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 19-02-0280.

Marcia Blum, Assistant Deputy Public Defender, argued the cause for appellant Marcus O. Morrisey in A-3616-22 (Jennifer N. Sellitti, Public Defender, attorney; Marcia Blum, of counsel and on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant Danron T. Morrisey in A-3927-22 (Frank M. Gennaro, Designated Counsel, on the brief).

Monica Lucinda do Outeiro, Assistant Prosecutor, argued the cause for respondent State of New Jersey in A-3616-22 (Raymond S. Santiago, Monmouth County Prosecutor, attorney; John J. Santoliquido, Assistant Prosecutor, of counsel and on the brief).

Raymond S. Santiago, Monmouth County Prosecutor, attorney for respondent State of New Jersey in A-3927-22 (John J. Santoliquido, Assistant Prosecutor, of counsel and on the brief).

Appellant, Marcus O. Morrisey, filed a pro se supplemental brief in A-3616-22.

Appellant, Danron T. Morrisey, filed a pro se supplemental brief in A-3927-22.

PER CURIAM

In these appeals calendared back-to-back and consolidated for purposes of our opinion, defendants Marcus O. Morrisey and Danron T. Morrisey,[1] uncle and nephew respectively, appeal from judgments of conviction (JOC) after a jury trial.  Alternatively, they appeal the sentences imposed.  We affirm the convictions but remand for the limited purpose of correcting merger errors in defendants' JOCs.

We recite the facts from the trial testimony.  In November 2018, Roger Gilbert[2] and his girlfriend, Shalyce Davis, lived in a second-floor apartment on Old Corlies Avenue in Neptune.  The apartment was above a barber shop and corner store and near a first aid building and gas station.  A convenience store was located across the street from Gilbert's apartment.

On November 10, 2018, Davis worked until 7:00 p.m., ran errands after work, and then went to the apartment.  Gilbert came home later and asked Davis where she put 100 grams of cocaine delivered to the apartment earlier that day.  Davis testified Gilbert sold cocaine, and she helped him occasionally.  Gilbert prearranged to sell thirty grams of cocaine to Marcus that evening.

---

[1]  Because defendants share the same last name, we refer to them by their first names.  No disrespect is intended.

[2]  Because the indictments reflected the victim's initials rather than his proper name, we refer to the victim by a pseudonym.

Davis knew Marcus from prior drug sales and other interactions. She testified Marcus went by the nickname "King."

After parceling out thirty grams of cocaine, Gilbert went downstairs to sell the drugs to Marcus, who waited outside the apartment. Davis testified she heard Gilbert and Marcus "going back and forth" just outside the apartment. Davis heard someone running down the stairs, and she left the apartment to investigate. Davis saw the two men outside the apartment door to the street. According to Davis, Marcus grabbed Gilbert's shirt in an effort to pull Gilbert off a small porch. Davis described the second man as tall with a skinny build, but could not identify him because he wore a black hooded sweatshirt with the hood pulled tightly around his head.

Davis heard the buzzing of a stun gun and saw a fluorescent light coming from Marcus's direction. She also heard a gunshot and smelled gunpowder, but did not see a gun. At that point, Davis and Gilbert "kind of fell back into the house" and fled up the stairs to their apartment. At the top of the stairs, Gilbert said he had been shot and fell to the ground face down.

Despite being shot, Gilbert told Davis to "get the stuff from out of the house." Davis understood Gilbert wanted her to dispose of the remaining cocaine in the apartment. Davis explained she was on parole for conspiracy to

4

commit murder, after serving ten years of a twelve-year sentence, and if she was found with drugs she could return to prison.

However, Davis did not move the drugs as Gilbert instructed. Instead, she called 9-1-1. While waiting for help to arrive, Davis repositioned Gilbert and applied pressure to his wound per instructions from the 9-1-1 operator.

The Neptune Police Department received the 9-1-1 call at about 9:20 p.m.[3] At the shooting scene, officers first encountered Davis, who was visibly shaken and upset. They found Gilbert at the top of the stairs, on his back, with an apparent gunshot wound. Gilbert was breathing shallowly and unable to speak.

Emergency medical personnel took Gilbert to the hospital, where he died from a single gunshot wound to his abdomen. The hospital recovered the bullet. Gilbert's clothing and body lacked evidence of soot, gunpowder, or muzzle imprint, which would be indicative of a shot fired at close range. He had marijuana, methamphetamine, fentanyl, and cocaine in his system.

In speaking with police at the scene, Davis explained she heard a tussle and left the apartment to investigate. Davis saw two men trying to pull Gilbert's shirt over his head. Gilbert told her to go back upstairs. Instead, Davis

---

[3] The lead investigator, Detective Kevin Condon, testified the 9-1-1 call reported "a shooting, robbery" near a corner store with attached apartments. There was no objection to this testimony.

intervened and attempted to push one of the men away from Gilbert. Davis thought she saw a stun gun but did not know which man had the weapon. She then heard a single gunshot and Gilbert said he had been hit. Gilbert retreated to the top of the stairs and collapsed.

Davis told the police she recognized one of the men as "King." She described King as male, over forty years old, bald, approximately five feet eleven inches tall, and weighing 200 pounds. Davis described the other individual as a black man, wearing a black hooded sweatshirt with the hood masking his face.

At the crime scene, Davis did not report a robbery. Because Davis did not consent to a search of the apartment, the police obtained a search warrant.

At trial, Davis initially did not remember whether anything had been stolen from Gilbert during the altercation with the two men. After seeing her recorded statement to the police, Davis recalled thirty grams of cocaine had been taken from Gilbert.

In processing the crime scene, the police found a 9 mm Luger cartridge casing stamped "WIN". A forensic ballistics expert determined the casing was a Winchester 9 mm Luger, which could hold a .38 caliber bullet. The bullet recovered from Gilbert's body was a .38 caliber.

A-3616-22

The State's ballistics expert testified there was no way to match a bullet to a casing after a bullet strikes something. The expert could only confirm the bullet and the casing were consistent with each other. He also testified at least sixty different firearms could have discharged the bullet that struck Gilbert.

About two months after the shooting, the casing found at the crime scene was linked to an unregistered 9 mm Smith & Wesson handgun police discovered on a pedestrian overpass in Asbury Park. Upon testing, the police determined this gun ejected the casing collected at the shooting scene.[4] Neither Marcus nor Danron had ever applied for, or been issued, a permit to purchase a gun.

In searching Gilbert's apartment, the police found 69.4 grams of cocaine, drug paraphernalia, and bags containing green vegetation. They also found a small quantity of marijuana in Gilbert's vehicle.

The night of the shooting, the police drove Davis to the Monmouth County Prosecutor's Office (MCPO) to give a statement. Davis provided a second statement to the MCPO on November 27, 2018.

In her first statement, Davis did not identify Marcus from the police-prepared photo array despite recognizing his photograph. At trial, Davis

---

[4] The police were unable to test the bullet recovered from Gilbert's body for consistency with the gun found in Asbury Park.

A-3616-22

explained she feared the unknown second person with Marcus the night of the shooting. Further, because she was on parole, Davis "didn't want to be entangled up in something like this again." A few days after the shooting, Davis "felt bad" and called one of the detectives. Davis then reviewed a second array and positively identified Marcus. At trial, Davis identified Marcus in the crime scene video.

Detective Condon led the MCPO's investigation of the shooting. As part of the MCPO's investigation, Condon explained the police obtained surveillance videos from several locations. The surveillance footage from the corner store depicted a dark-colored sedan driving to Gilbert's apartment building, leaving Marcus outside, and driving off.

The crime scene video, which depicted events just before Gilbert's shooting, showed Marcus using a stun gun and the second man firing a handgun. The video did not capture the actual shooting.

Other surveillance video obtained by the police came from a convenience store across the street from Gilbert's apartment. The convenience store video showed Marcus walking into the store, pacing, and meeting with a second person who arrived in a dark-colored Nissan Altima. According to Condon, the appearance of the second individual in the convenience store video "matche[d]

8

the clothing description and physical stature . . . of the second person who [was] on the . . . footage" from the corner store. Condon explained the convenience store video showed a "thin, five-nine, black male, all in black jogging suit with a white t-shirt . . . underneath . . . stick[ing] out at the waistline."

Condon also described a video obtained from a first aid building near Gilbert's apartment. The first aid video captured a car dropping Marcus at the corner store, the car leaving the area, and Marcus walking toward the convenience store.

Condon testified the MCPO circulated a law enforcement flyer describing the shooting incident and including still photographs of the two individuals captured on the surveillance videos. Officer Javon Britt, of the Asbury Park Police Department at the time, responded to the flyer. Britt reported he was related to Marcus and identified him from one of the still photographs.

Britt then went to the MCPO and reviewed footage from the surveillance videos. In the convenience store video, Britt identified his uncle Marcus, who went by the name "King," and his cousin Danron. Upon review of the corner store video, Britt identified Marcus but was unable to identify the second person in the footage.

Initially, Condon mistakenly testified Britt identified Danron from the corner store video. However, Condon later clarified he understood the second person in the corner store video was Danron based on Britt's identification of Danron in the convenience store video, because "the footage from [convenience store] and the . . . [c]orner [s]tore, it's the same two people in the same videos."

A few days after the shooting, Samantha Wallace contacted a Wall Township Police Officer and a New Jersey State Trooper. Wallace previously provided information to both law enforcement officers in exchange for leniency related to her own criminal charges. Although Wallace faced criminal charges in November 2018, she did not believe any of the charges would result in prison time. Wallace regularly used drugs around the time of the shooting and had several convictions for drug-related offenses.

The law enforcement officers referred Wallace to the MCPO. Wallace gave the MCPO a statement about events on the date of the shooting. After Wallace gave her statement, the MCPO gave her meal vouchers and a five-day stay in a motel. Condon testified it was not unusual to provide such items to people who came forward with information relevant to an investigation. However, Condon stated no one at the MCPO promised Wallace any benefits in exchange for her statement.

Wallace testified she met Marcus through a friend, Diedre Davis.[5] Wallace got high with Marcus, and he gave her drugs in exchange for sexual favors. Marcus introduced Wallace to Gilbert. Wallace testified she spent time at Gilbert's apartment before the shooting. According to Wallace, Marcus asked her to set Gilbert up for a robbery.

On the morning and afternoon of the shooting, Wallace and Diedre spent time with Marcus at two separate residences in Eatontown. According to Wallace, the trio used cocaine throughout the day until they exhausted their supply.

At some point, Wallace and Diedre told Marcus that Gilbert made negative comments about him. Wallace testified that Marcus became angry and planned to confront Gilbert. Wallace then gave Gilbert's cellphone number to Marcus. Wallace listened as Marcus telephoned Gilbert to arrange a cocaine buy.

Wallace and Marcus left Eatontown to go to the Neptune home of Marcus's ex-wife, Denise Morrisey. According to Wallace, Marcus wore a tan jacket, white shirt, and blue jeans, and brought several garbage bags containing

---

[5] Because this matter involved two individuals named "Davis," we refer to Wallace's friend by her first name. No disrespect is intended.

A-3616-22

his belongings to his ex-wife's house.  Denise's boyfriend, Troy Hill, was also at the house.

Wallace testified Marcus spoke to Denise and Hill in a bedroom.  Hill then left the house.  A short while later, Marcus also left and said he would be right back.

Denise's testimony differed slightly.  She said Marcus brought his bags into her house and then spent time talking to his daughter, who was also in the house.  She said Marcus spoke to Hill in her bedroom, while she remained in the living room with Wallace.  Denise testified she never saw Marcus leave her house.  However, she admitted he "wasn't in [her] eyesight" at some point and she "didn't know if he left or not."

While waiting for Marcus to return, Wallace fell asleep.  According to Wallace, when Marcus returned to Denise's house, he appeared "frantic," "frazzled," and "all over the place."  Marcus rushed Wallace to "get [her] shit" so they could leave the house.  Marcus asked Denise to give them a ride.

Denise drove Marcus and Wallace to a house in Eatontown.  Marcus sat in the front passenger seat and Wallace sat behind him. Wallace testified Marcus handed her a black gun and told her to put the gun in her bag.  Wallace was stunned but put the gun in her bag as Marcus instructed.

Denise testified she did not see Marcus turn and speak to Wallace in the car. Nor did she see Marcus hand anything to Wallace. According to Denise, no one spoke during the drive from Neptune to Eatontown, and Wallace did not have a bag with her. However, video of Denise's home from a camera located at a neighbor's house showed Wallace had a handbag.

No one was home when they arrived at the Eatontown residence. According to Wallace, she and Marcus waited for a taxi to drive them to an apartment in Eatontown. Wallace described Marcus as "frantic" and recalled he said something like: "[I]f he's going to do something, he's got to do it himself. That nobody is going to disrespect him." Wallace then asked Marcus if he shot Gilbert. Marcus responded, "yes."

The taxi took Wallace and Marcus to the Eatontown apartment. During the taxi ride, Wallace said Marcus called Denise, explained he left his jacket at her house, and asked Denise to bring his jacket to the Eatontown apartment. Shortly after Wallace and Marcus reached the Eatontown apartment, Denise and Hill arrived with Marcus's jacket. At Marcus's direction, Wallace gave him the gun. Marcus then gave the gun to Hill.

Denise gave a slightly different version of these events. She claimed after she got home, Marcus called and asked her to bring his bookbag and liquor

bottle. She and Hill then drove to an apartment in Eatontown. Denise said Hill got out of the car to give the items to Marcus. Hill and Marcus then walked away from the car. Denise did not see Hill and Marcus for several minutes. Nor did she see any items transferred between the men. Thereafter, Denise and Hill left Eatontown and returned to her house.

According to Wallace, Marcus then left the Eatontown apartment. However, she stayed a while longer. Wallace testified Marcus wanted her to leave with him, but she was scared because she knew Marcus killed Gilbert. According to Wallace, she never saw Marcus with a gun before the night of the shooting. However, Wallace previously saw Marcus with a stun gun. Wallace was concerned her fingerprints might be on the gun. She explained that was the reason she contacted the police.

Wallace testified that before Marcus left Eatontown, he gave Wallace two bundles of heroin. Wallace said Marcus had cocaine as well, which he gave to a roommate who lived in the apartment.

In speaking with the police, Wallace identified Marcus in a photo array as the person she was with on the day of the shooting and the one who gave her the gun. She also selected a photograph of Hill, whom she identified as Denise's boyfriend.

14

Wallace gave police permission to search her cellphone. The search revealed a number associated with Marcus and a number associated with the roommate in the Eatontown apartment. Marcus used the roommate's cellphone instead of his own on the day of the shooting. From the roommate's cellphone, the police discovered four calls to Hill on November 10, 2018, with the last call made at 8:38 p.m.

After speaking with Wallace, the police spoke with Denise. She gave a statement to the police and allowed them to search her cellphone. The police also investigated the area around Denise's home for potential evidence.

The police obtained surveillance video from a neighbor's house located across from Denise's home. The neighbor's video captured activity in and around Denise's residence on the evening of November 10. The jury saw clips from the neighbor's video.

Detective Condon testified the neighbor's video corroborated Wallace's statements to the police. The video showed Wallace and Marcus arrive by car at Denise's house and move bags from the car into her house. In videos before and after the shooting, Condon noted a dark-colored sedan with a sticker on the rear windshield.

Initially, Condon testified he saw Marcus and Danron in the neighbor's video. However, defense counsel objected and requested a mistrial because the visual distance from the neighbor's home to Denise's home precluded identification of the individuals in the neighbor's video. The judge denied the mistrial. The next day, the prosecutor had Condon clarify that no individuals could be identified from the neighbor's video.

On November 16, 2018, the police contacted Danron, who consented to an interview. Because the police believed Danron was a suspect in Gilbert's shooting, they issued Miranda[6] warnings.

The jury saw a redacted version of Danron's statement to the police. Danron told the police that on the night of the shooting, he went out with his friend, Louis Sloan, in his aunt's rental car—a black Nissan. He explained he bumped into his uncle Marcus at the convenience store that night. He also admitted the convenience store video captured him talking with Marcus. After leaving the convenience store, Danron claimed he arrived at his girlfriend's

---

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

 A-3616-22

apartment in Eatontown around 8:30 p.m. Danron denied any involvement in Gilbert's shooting.[7]

After speaking with Danron, the police contacted a local car dealership and spoke to the service manager about rental cars. Another dealership employee testified at trial and explained Danron's aunt rented a black Nissan Altima on October 12, 2018, and returned the car on November 12, 2018, two days after the shooting. Because the dealership conducted a routine cleaning upon the car's return, the police elected not to have the car examined by a forensic expert. However, the police noted the returned rental car displayed distinctive stickers. The stickers were consistent with the rear windshield sticker observed on the dark-colored sedan in the neighbor's video.

Additionally, Condon testified regarding cellphone records obtained from November 10, 2018. Based on those cellphone records, Condon explained: on the afternoon of November 10, 2018, there were several calls between Danron and Denise; on the afternoon and evening of November 10, 2018, before the shooting,[8] Marcus called Gilbert several times, and there were numerous calls

---

[7] According to the timestamp on the convenience store video, Danron was in the store at 8:54 p.m., which contradicted his statement to the police regarding the timing of his visit to his girlfriend.

[8] The shooting occurred at approximately 9:20 p.m. on November 10, 2018.

between Marcus and Danron; between 9:01 p.m. and 10:08 p.m., there were no calls between Marcus and Danron; after the shooting, and throughout the afternoon of November 11, 2018, Marcus made a number of calls to Denise and Danron; on the afternoon of November 11 and 12, 2018, Denise made several calls to Danron; and on November 11 and 12, 2018, Wallace made calls to Marcus.

In February 2019, a Monmouth County grand jury returned Indictment No. 19-02-0280 against defendants. Defendants were charged with: first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (a)(2), (count one); first-degree armed robbery, N.J.S.A. 2C:15-1, (count two); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3), (count three); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), (count four); and second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1), (count five). As to Marcus only, the indictment charged: fourth-degree possession of a prohibited stun gun, N.J.S.A. 2C:39-3, (count six); and third-degree possession of a stun gun for an unlawful purpose, N.J.S.A. 2C:39-4(d), (count seven).

Defendants moved to dismiss the indictment based upon the grand jury presentation. The judge denied the motion in an order and written decision dated August 30, 2019.

On August 25, 2020, the court considered a motion to sever filed by Danron's attorney. Marcus did not join the motion. The judge denied the motion in a decision placed on the record on that date.

Thereafter, Danron renewed his motion to sever. Marcus joined the motion. The judge heard the motion on August 5, 2021. Before ruling on the motion, the judge conducted an in-camera hearing with Marcus and his attorney. The judge requested a proffer from Marcus as to his anticipated testimony if the trials were severed. In an oral opinion issued on November 5, 2021, and an order entered on November 8, 2021, the judge denied defendants' severance motion.

In 2022, defendants filed new motions to dismiss the indictment based upon the grand jury presentation. A different judge, who ultimately tried the case, heard argument on November 1, 2022, and denied the motions in a written decision and order dated November 7, 2022.

Defendants' trial took place between January 25 and February 13, 2023. At the end of the State's case, defendants moved for a judgment of acquittal, which the judge denied.

The jury found defendants guilty on all counts.

On June 28, 2023, the trial judge considered defendants' motions for a new trial. Two days later, the judge issued an order and written opinion denying the motions.

On July 12, 2023, the judge sentenced defendants. The judge sentenced Marcus to an aggregate life term of seventy-five years in prison, with an eighty-five percent parole ineligibility period under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2(a), on the murder, felony murder, and robbery convictions. The judge sentenced Danron to an aggregate term of fifty-five years in prison, with an eighty-five percent period of parole ineligibility under NERA on the murder, felony murder, and robbery convictions. On July 14, 2023, the judge entered JOCs as to defendants.

Marcus and Danron appealed.

The following arguments are raised in Marcus's counseled brief:

POINT I

> THE COURT VIOLATED DEFENDANT'S RIGHT TO PRESENT A COMPLETE DEFENSE AND THE RULES OF EVIDENCE WHEN IT EXCLUDED THE PHOTOGRAPH OF THE SMITH & WESSON HANDGUN AND LOADED MAGAZINE ON THE DECEDENT'S CELLPHONE, WHICH THE COURT FOUND WAS PHOTOGRAPHED IN THE DECEDENT'S APARTMENT AND WHICH THE DECEDENT TEXTED TO A FRIEND [EIGHTEEN]

20

DAYS BEFORE THE DECEDENT'S ENCOUNTER WITH DEFENDANTS.

A. Gilbert's cellphone photograph of the Smith & Wesson handgun was admissible under the evidence rules.

    1. N.J.R.E. 401. Relevant Evidence
       N.J.R.E. 403. Exclusion of Relevant Evidence.

    2. N.J.R.E. 804. Hearsay Exceptions: Declarant Unavailable.

    3. N.J.R.E. 803(c)(25). Hearsay Exceptions: Statement Against Interest.

    4. N.J.R.E. 901. Authentication or Identification.

    5. Reverse 404(b) Evidence.

B. Right to present a complete defense.

POINT II

THE INDICTMENT SHOULD HAVE BEEN DISMISSED DUE TO THE MULTIPLE INSTANCES OF PROSECUTORIAL MISCONDUCT; AT A MINIMUM, COUNTS [ONE] AND [FIVE], IN WHICH DEFENDANT WAS CHARGED AS AN ACCOMPLICE, SHOULD HAVE BEEN DISMISSED BECAUSE, IN ADDITION TO ITS MISCONDUCT, THE STATE FAILED TO PRESENT PROBABLE CAUSE TO BELIEVE DEFENDANT ACTED AS AN ACCOMPLICE IN THE COMMISSION OF THOSE OFFENSES.

POINT III

THE STATE'S RACIALLY BIASED PEREMPTORY STRIKE OF JUROR NO. [THIRTEEN] VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS AND A FAIR JURY.

POINT IV

THE MATTER MUST BE REMANDED FOR A NEW SENTENCING HEARING BECAUSE, IN IMPOSING [AN] EXCESSIVE LIFE TERM, WHICH IS GREATER THAN THE SENTENCE THE STATE REQUESTED, THE COURT PENALIZED DEFENDANT FOR EXERCISING HIS CONSTITUTIONAL RIGHTS TO REMAIN SILENT AND TO TRIAL AND MISTAKENLY IMPOSED SEPARATE SENTENCES ON THE FELONY-MURDER AND MURDER CONVICTIONS WHEN THOSE CONVICTIONS SHOULD HAVE MERGED.

In a supplemental brief, counsel filed an additional point:

[POINT V]

THE PERSISTENT-OFFENDER EXTENDED-TERM IMPOSED UNDER N.J.S.A. 2C:44-3A IS ILLEGAL AND UNCONSTITUTIONAL AND MUST BE VACATED. (Not Raised Below)

Marcus raises the following arguments in his supplemental pro se brief:

POINT I

THE TRIAL COURT ABUSED [ITS] DISCRETION FOR ALLOWING SHALYCE DAVIS TO TESTIFY TO NEW EVIDENCE PRESENTED MID[-]TRIAL AFTER THE PROSECUTION COMMITTED A

22

DISCOVERY VIOLATION[] BY PROVIDING THE DEFENSE WITH THE NEW STATEMENT EIGHT DAYS AFTER IT WAS CONDUCTED. THUS DENYING DEFENDANT ADEQUATE TIME TO INVESTIGATE AND PREPARE. VIOLATING DEFENDANT'S RIGHT TO A FAIR TRIAL. THEREFORE A NEW TRIAL IS WARRANTED. U.S. CONST. AMEND[S]. VI[,] IX[;] N.J. CONST., ART. 1 PAR. 10.

POINT II

THE TRIAL COURT ABUSED [ITS] DISCRETION FOR NOT ALLOWING DEFENSE COUNSEL TO CROSS-EXAMINE SAMANTHA WALLACE ON PAST INCIDENTS OF UNTRUTHFULNESS. THE TRIAL COURT[']S APPLICATION OF RULE 608 WAS UNREASONABLE. THUS DEFENDANT IS ENTITLED TO A NEW TRIAL. U.S. CONST. AMENDS[.] VI[,] XIV[;] N.J. CONST., ART. 1 PAR. 10.

The following arguments are raised in Danron's counseled brief:

POINT ONE

THE TRIAL COURT IMPROPERLY DENIED DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT.

POINT TWO

THE TRIAL COURT WRONGFULLY DENIED DEFENDANT'S MOTIONS TO SEVER DEFENDANTS.

23

POINT THREE

DETECTIVE CONDON'S IMPROPER NARRATION OF THE SURVEILLANCE VIDEOS INTRODUCED INADMISSIBLE LAY OPINION TESTIMONY AS TO IDENTIFICATION WHICH DENIED DEFENDANT A FAIR TRIAL. (Partially Raised Below)

POINT FOUR

THE TRIAL COURT IMPROPERLY EXCLUDED OTHER CRIMES EVIDENCE OFFERED BY THE DEFENDANT.

POINT FIVE

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL.

POINT SIX

DEFENDANT'S SENTENCE OF FIFTY-FIVE YEARS SUBJECT TO [NERA] IS MANIFESTLY EXCESSIVE AND THE CONVICTION FOR FELONY MURDER MUST BE MERGED.

Danron raises the following arguments in his supplemental pro se brief:

POINT I

THE TRIAL COURT ERRED BY MAKING THE BOLSTEROUS (sic) STATEMENT THAT THE VIDEO SHOWED OF THE CRIME SCENE DEPICTED THE DEFENDANT WAS SEEN WITH A GUN.

24

POINT II

THE TRIAL COURT IMPROPERLY DENIED
DEFENDANT'S MOTION TO DISMISS THE
INDICTMENT.

POINT III

THE TRIAL JUDGE ERRED DURING THE MODEL
JURY CHARGE OF ACCOMPLI[CE] LIABILITY.

I.

Defendants contend the judge erred in excluding a photograph depicting a handgun lying on brown carpet similar to the carpet in Gilbert's apartment. We disagree.

The photograph, sent as part of a text message eighteen days before the shooting, was extracted from Gilbert's cellphone. The photograph lacked any "surrounding context" and was transmitted within a text conversation regarding the purchase of cars and the sum of $6,000.

Defense counsel sought to introduce the photograph because the State's evidence did not rule out a second weapon at the crime scene. In support of admission of the photograph, defense counsel noted the following: Gilbert's last words to Davis could have referred to hiding a gun rather than drugs; the State never tested the bullet recovered from Gilbert's body against the gun found in Asbury Park, leaving open the question of whether the bullet came from that

25

gun; the gun in the photograph had "identifying information that place[d] it in a certain category of weapons which could have produced" the bullet recovered from Gilbert; the crime scene video did not capture the bullet striking Gilbert; the crime scene video depicted a masked individual shooting upward into the stairwell; the fatal bullet entered Gilbert's body at a downward angle; and "there were a couple of dents and dings and holes potentially in the . . . residence that were never tested for gunshot residue," so "there may have been a bullet strike unrelated to the actual projectile that was recovered from" Gilbert. In addition, defense counsel argued the photograph supported the defense theory that "the police officers did a shoddy investigation."

The judge ruled the photograph could not be used as evidence at trial. The judge determined the photograph constituted hearsay because it was offered for the truth of the matter asserted. The judge stated admission of the photograph required defense counsel to demonstrate the gun in the photograph existed around the time of the shooting and that Gilbert possessed the weapon. The judge found "there [was] no evidence that . . . anyone can authenticate the actual photograph as, one, [Gilbert]'s gun; or two, that he had it in his possession at the time of the incident." Because defense counsel failed to articulate any

applicable exception to the rule against hearsay, the judge excluded the photograph.

Even if defendants were able to overcome the rule against hearsay, the judge further stated the photograph was not relevant under N.J.R.E. 401. The judge explained there was no logical connection to be drawn between the photograph and the crime scene. Additionally, to the extent the photograph had any probative value, the judge found the prejudice to the State outweighed its probative value under N.J.R.E. 403.

However, the judge allowed defense counsel to argue the possible existence of a second weapon at the crime scene and shoddy investigative work by the police. Consistent with this ruling, Marcus's attorney argued in summation that the police failed to conduct a thorough investigation, the Asbury Park gun was not the murder weapon, Gilbert had his own gun, and Davis disposed of the gun after the shooting.

Defendants renewed their arguments regarding admission of the photograph in their motions for a new trial. The judge rejected the arguments for the reasons he previously stated.

We review the trial court's evidentiary ruling for abuse of discretion, considering whether the ruling was "made without a rational explanation,

27

inexplicably departed from established policies, or rested on an impermissible basis." State v. Burney, 255 N.J. 1, 20 (2023) (quoting State v. Chavies, 247 N.J. 245, 257 (2021)). Evidentiary rulings are entitled to deference and should be affirmed absent a clear error of judgment resulting in a manifest denial of justice. State v. Singh, 245 N.J. 1, 12-13 (2021).

Having reviewed the record, we are satisfied the judge's exclusion of the photograph was not an abuse of discretion. His decision was supported by the facts in this case and the Rules of Evidence.

The photograph constituted hearsay. Hearsay is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." N.J.R.E. 801(c).

Marcus sought to introduce the photograph to prove the "truth" of the matter asserted—that Gilbert possessed a gun on the night of the shooting. Marcus wanted to argue that Gilbert was shot by his own gun rather than the gun held by the second individual in the crime scene video. Marcus further intended to argue that the failure of the police to investigate the possibility of Gilbert owning a gun constituted sloppy police work.

Because the photograph constituted hearsay, the document was inadmissible absent an exception to the hearsay rule. N.J.R.E. 802; State v. Buda, 195 N.J. 278, 292 (2008). No applicable exception to the hearsay rule was presented to the judge.

On appeal, Marcus now asserts another exception to the hearsay rule for admission of the photograph. He argues the photograph constituted a statement against interest by an unavailable declarant. Because Gilbert is unavailable declarant, Marcus contends the photograph was admissible under N.J.R.E. 803(c)(25), N.J.R.E. 804(b)(3), and N.J.R.E. 804(a)(4). State v. Tormasi, 443 N.J. Super. 146, 153 (App. Div. 2015) ("An accused is entitled to offer a statement against interest made by another, usually for the purpose of demonstrating the guilt of another, so long as the statement falls within the other parameters of N.J.R.E. 803(c)(25) [relocated in 2024 to N.J.R.E. 804(b)(3)].").

We are satisfied the photograph was not a statement against interest by Gilbert. The meaning of the photograph is unknown. There is no evidence indicating the purpose for which Gilbert transmitted the photograph. Absent testimony from a competent witness—such as the photograph's recipient—about the content of the photograph and the meaning of the text message related to the photograph, see, e.g., State v. Hannah, 448 N.J. Super. 78, 85-92 (App. Div.

29

2016) (social media messages authenticated by participant in the communications), it is unclear how Marcus could establish the photograph constituted a statement against interest.

Additionally, the judge correctly concluded the photograph was not relevant. N.J.R.E. 401 defines relevant evidence as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." See State v. Williams, 240 N.J. 225, 235-37 (2019).

In this case, the photograph lacked a tendency to prove either Gilbert or Davis had a gun on the night of the shooting. At best, the photograph established Gilbert had a gun eighteen days before the shooting. However, the record does not reflect when the photo was taken or who took the photograph. N.J.R.E. 901; State v. Hockett, 443 N.J. Super. 605, 613 (App. Div. 2016) (photograph authenticated by person present when photo was taken).

Based on the foregoing, the judge did not abuse his discretion in concluding the de minimis probative value of the photograph, untethered to information supporting who took the image and when, was outweighed by the risk of undue prejudice, confusing of the issues, or misleading the jury. Thus, the photograph was properly excluded under N.J.R.E. 403. Williams, 240 N.J. at 237-38.

II.

We next consider defendants' arguments the judge erred in denying the motions to dismiss the indictment. We reject their arguments.

In support of his claim, Marcus argues: (1) the prosecutor "did not provide probable cause to believe that [Marcus] was in constructive possession of the gun," and the prosecutor inaccurately instructed the grand jury as to the law governing accomplice liability; (2) there was insufficient evidence to support the robbery and felony murder charges because there was no evidence defendants stole anything from Gilbert; and (3) the prosecutor erred by eliciting false testimony ballistics testing established the fatal bullet came from the gun found in Asbury Park and inferring Marcus had a criminal record.

In support of his claim, Danron argues: (1) the prosecutor erred in eliciting testimony that Britt identified him in the crime scene video; (2) there was insufficient evidence supporting the robbery and felony murder charges because there was no evidence defendants stole anything from Gilbert; and (3) "the inaccurate identification testimony . . . coupled with [the judge]'s findings that the prosecutor made improper comments by referring to the incident as 'the murder' and the suspects as 'killers'" warranted dismissal of the indictment for

31

prosecutorial misconduct.   In his pro se brief, Danron also argues the prosecutor's legal instructions to the grand jury were flawed.

Grand Jury Proceedings

The prosecutor presented the State's case against defendants solely through Condon's testimony.  The prosecutor also instructed the grand jury as to the law governing the charged offenses.

Condon testified Neptune Township received a 9-1-1 call from Davis, who said her boyfriend had been shot.  The responding officers found Gilbert with a single gunshot wound to the abdomen.  Emergency responders took Gilbert to the hospital, but he did not survive.  Condon told the grand jury the medical examiner classified Gilbert's death as a homicide.

Condon also told the grand jurors about Davis's retelling of the shooting to the police.  She stated Gilbert returned to the apartment, spoke briefly with her, and went downstairs to talk with someone.  Thereafter, she heard commotion and went downstairs.  She saw a man she knew as "King" fighting with Gilbert in the stairwell and observed a second man at the bottom of the stairwell, dressed all in black, wearing a hooded sweatshirt with the hood masking his face.  She saw a stun gun and retreated to the apartment to call the

32

police.  She then heard a single gunshot.  When Davis returned to the stairwell, she found Gilbert on the stairs and the two men gone.

Condon testified the police were able to identify "King" as Marcus and the police knew Marcus had associated with Gilbert.

Condon further testified the police obtained surveillance videos from multiple sources.  He explained the video footage captured the following: Marcus waiting outside Gilbert's apartment building; Gilbert returning home and speaking with Marcus; Gilbert holding a package, walking upstairs, and dropping off the package; Marcus motioning to a second man in the parking lot near Gilbert's apartment to come forward and the second man doing so; Gilbert returning downstairs and being assaulted by Marcus, who had a stun gun, and the second man, who had a gun; and Marcus and the second man leaving the scene.

Condon testified the second man was not identified initially.  However, the police obtained additional surveillance videos depicting events prior to the shooting, including the following: Marcus and another man meeting at the convenience store across the street from Gilbert's apartment; the two men being dropped off separately in a dark-colored Nissan Altima; and the car being driven by a third person.  Condon testified the police identified the second man in the

convenience store video as the second man in the crime scene video "based on his clothing and . . . [the] specifics of what he was wearing." Additionally, Condon testified Britt identified the men in the convenience store video as his uncle Marcus and his cousin Danron.

According to Condon's grand jury testimony, after waiving his <u>Miranda</u> rights, Danron told the police he was the second man in the convenience store video talking to Marcus. He said he was in the area that night with his friend, Sloan, for a drug transaction. He and Sloan ran into Marcus at the convenience store. After leaving the convenience store, Danron claimed he and Sloan drove somewhere and smoked marijuana. Daron also stated he visited his girlfriend around 8:30 p.m. on the night of the shooting.

Condon testified that when the police investigated the Nissan Altima, they learned Danron's aunt rented the car from a local dealership for Danron's use and returned the car the first business day after the shooting. Condon further testified the Nissan Altima bore a distinguishing sticker, identifying the vehicle as a rental, and the sticker was visible in some of the surveillance videos.

Danron also told the grand jury that when the police met with Davis a second time, she positively identified Marcus but could not identify the second individual. Because the police found a substantial quantity of drugs in the

34

apartment Davis shared with Gilbert, Davis admitted on the night of the shooting Marcus arranged to buy drugs from Gilbert. The prosecutor then asked Condon if the police found anything "on [Gilbert's] person, in his pockets, or in a knapsack or in a bag." Condon responded nothing was found.

At the grand jury proceeding, Condon further testified the police spoke with Wallace. Wallace told the police that on the night of the shooting, she and Marcus took an Uber to Denise's home in Neptune. Denise's house was not far from Gilbert's apartment. Wallace reported to the police that Marcus went into a bedroom in Denise's home and spoke with someone. That individual then left the house and Marcus left soon after.

Condon testified that shortly after the shooting, Marcus returned to Denise's house. Marcus told Wallace to retrieve their belongings because they were leaving. Denise drove Marcus and Wallace to another location. In the car, Wallace reached into one of Marcus's bags and inadvertently grabbed a handgun. Wallace reported to the police that Marcus had a stun gun with him before the shooting, but he left it at Denise's house.

Condon also told the grand jury about the surveillance videos recovered by the police. He explained the videos depicted the same men, wearing the same clothing, and traveling in the same vehicle. According to Condon's testimony,

the police obtained surveillance video from a neighbor's home near Denise's house that captured about thirty to forty-five minutes of footage prior to Gilbert's murder. Condon testified the neighbor's video depicted: a black Nissan Altima arriving at Denise's house with Danron at the wheel; Danron exiting the car and speaking to Marcus; and Danron and Marcus then getting into the car, with Danron in the driver's seat and Marcus in the rear passenger seat.

Condon also described the surveillance videos from locations near the crime scene. He identified the following from the various videos: a Nissan Altima arriving at Gilbert's apartment; Marcus exiting the car's rear passenger seat; the Nissan Altima driving off; Marcus walking across the street to the convenience store; and Marcus walking back to the crime scene. Condon also explained the convenience store video captured Danron exiting the front passenger seat of the Nissan Altima and speaking with Marcus inside the store. Condon also described surveillance video showing Marcus walking away from the crime scene toward a Nissan Altima at a gas station down the street from Gilbert's apartment. Condon next described a video depicting a Nissan Altima arriving at Denise's house after the shooting around 9:20 p.m. Marcus then got out of the car and it drove away. About five minutes later, Denise left her house and drove away with Marcus and Wallace.

A-3616-22

Condon also testified the police recovered a handgun in Asbury Park. He stated ballistics testing matched that gun to the bullet recovered from Gilbert. The police never found the stun gun. According to Condon, Marcus and Danron were not registered to own any guns.

Motions to Dismiss Indictment

Before trial, defendants twice moved to dismiss the indictment. Both motions were denied.

Regarding the first motions, the pretrial judge concluded: the State presented sufficient evidence to support the charges, with Marcus and Danron having a shared intent and shared participation in the robbery and homicide; Gilbert having no money or drugs at the crime scene post-shooting, notwithstanding Gilbert's arranged drug transaction with Marcus; and the prosecutor having not engaged in misconduct through his questions to the witness or instructions to the grand jury.

Regarding the second motions, the trial judge expressed disapproval of the prosecutor's statements to the grand jury, referring to the shooting as a "murder" and defendants as "killers." Notwithstanding his disapproval of the prosecutor's choice of words, the judge concluded the language did not warrant dismissal of the indictment, because the grand jury engaged in thoughtful

questioning of both the evidence and the law and maintained its independence in returning the indictment.

Based on the testimony and law presented to the grand jury, we review defendants' prosecutorial misconduct arguments. Under Article I, ¶ 8 of the New Jersey Constitution: "No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury." "The grand jury must be presented with sufficient evidence to justify the issuance of an indictment," and "[t]he absence of any evidence to support the charges would render the indictment 'palpably defective' and subject to dismissal." State v. Morrison, 188 N.J. 2, 12 (2006) (quoting State v. Hogan, 144 N.J. 216, 228-29 (1996)); see also State v. Twiggs, 233 N.J. 513, 544 (2018).

"At the grand jury stage, the State is not required to present enough evidence to sustain a conviction." State v. Feliciano, 224 N.J. 351, 380 (2016). The grand jury is an accusatory rather than adjudicative body, and it determines only whether probable cause exists to believe a crime has been committed. State v. Bell, 241 N.J. 552, 559 (2020). The prosecutor need only present "some evidence establishing each element of the crime to make out a prima facie case." Morrison, 188 N.J. at 12. "The quantum of this evidence . . . need not be great." State v. Schenkolewski, 301 N.J. Super. 115, 137 (App. Div. 1997).

Accordingly, grand jury presentations are generally abbreviated, without strict adherence to evidentiary rules. State v. Tucker, 473 N.J. Super. 329, 342-43 (App. Div. 2022). Further, "[c]redibility determinations and resolution of factual disputes are reserved almost exclusively for the petit jury." Hogan, 144 N.J. at 235.

"[I]n reviewing the grand jury record on a motion to dismiss an indictment, the trial court should use a standard similar to that applicable in a motion for a judgment of acquittal at trial" under Rule 3:18-1. Morrison, 188 N.J. at 13. "The court should evaluate whether, viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it." Ibid.

Prosecutorial misconduct before the grand jury could warrant dismissal of an indictment, but only if the misconduct interfered with the grand jurors' independence and affected their ability to make an informed decision. See Hogan, 144 N.J. at 229. The prosecutor "may not deceive the grand jury or present . . . evidence in a way that is tantamount to telling the grand jury a 'half-truth.'" Id. at 236. Additionally, the prosecutor may not provide the grand jury with inaccurate or misleading instructions on the law. Bell, 241 N.J. at 561.

A-3616-22

However, "[i]ncomplete or imprecise grand-jury instructions do not necessarily warrant dismissal of an indictment; rather, the instructions must be 'blatantly wrong.'" State v. Triestman, 416 N.J. Super. 195, 205 (App. Div. 2010) (quoting State v. Hogan, 336 N.J. Super. 319, 344 (App. Div. 2001)).

Ultimately, "the decision whether to dismiss an indictment lies within the discretion of the trial court, and that exercise of discretionary authority ordinarily will not be disturbed on appeal unless it has been clearly abused." Hogan, 144 N.J. at 229 (first citing State v. McCrary, 97 N.J. 132, 144 (1984), and then citing State v. Weleck, 10 N.J. 355, 364 (1952)). Additionally, we generally defer to the trial court's factual findings on pretrial motions. State v. S.S., 229 N.J. 360, 379-80 (2017).

"[A] guilty verdict is universally considered to render error in the grand jury process harmless." State v. Simon, 421 N.J. Super. 547, 551 (App. Div. 2011). Even assuming there were errors in the grand jury proceedings, those errors are typically cured by a petit jury's guilty verdict. State v. Cook, 330 N.J. Super. 395, 411 (App. Div. 2000) (concluding a guilty verdict rendered harmless any failure to present exculpatory evidence to the grand jury); State v. Laws, 262 N.J. Super. 551, 563 (App. Div. 1993) (holding the slight chance that the grand jury was uninformed as to the law "was rendered moot by defendant's

subsequent trial and convictions"); State v. Ball, 268 N.J. Super. 72, 120 (App. Div. 1993) (concluding that even if grand jury instructions were erroneous, the error was rendered moot by a later conviction at trial), aff'd, 141 N.J. 142 (1995).

Having reviewed the record, we discern no abuse of discretion in the judges' denials of the motions to dismiss the indictments. The evidence presented to the grand jury supported the indictment, which included: evidence of Marcus's coordinating with Danron before, during, and after the shooting; video evidence showing the men were armed during the interaction with Gilbert; the men using a stun gun and handgun to attack Gilbert; a gunshot killing Gilbert; and defendants lacking a gun permit. The grand jury record supported the finding Marcus directed the events prior to the shooting, controlled the gun because he motioned for Danron to appear in Gilbert's doorway, and disposed of the gun after the shooting. The grand jury record also revealed Marcus planned to purchase drugs from Gilbert, Gilbert arranged to sell drugs to Marcus the night of the shooting, and Gilbert had no money or drugs on his person after the shooting.

The foregoing evidence was sufficient to support the grand jury's finding of probable cause to charge defendants with murder, armed robbery, felony murder, unlawful possession of a weapon, possession of a weapon for an

unlawful purpose, and possession of a prohibited weapon. Further, the evidence presented to the grand jury was sufficient to establish Marcus had constructive possession of the handgun. State v. Randolph, 228 N.J. 566, 591-92 (2017).

Regarding the robbery, the State was not obligated to prove completion of a theft for a robbery to occur. N.J.S.A. 2C:15-1(a) ("An act shall be deemed to be included in the phrase 'in the course of committing a theft' if it occurs in an attempt to commit theft or in immediately flight after the attempt or commission."); see also State v. Dehart, 430 N.J. Super. 108, 116-17 (App. Div. 2013).

Nor does the grand jury record reflect any error in the prosecutor's recitation of the law to the grand jury. In responding to questions from the grand jurors regarding culpability for the crimes, the prosecutor accurately instructed that a defendant's intent could be inferred from the circumstances, State v. Jenewicz, 193 N.J. 440, 451 (2008), and gave an example of accomplice liability. Although the prosecutor could have given a more detailed instruction on accomplice liability consistent with N.J.S.A. 2C:2-6(c), and avoided use of the colloquial phrase "in for a penny, in for a pound," the grand jury was neither misled nor inaccurately charged. More detailed jury instructions are appropriate for trial. Ball, 268 N.J. Super. at 120. See also Laws, 262 N.J. Super. at 562

(finding no constitutional obligation for a prosecutor to provide a "verbatim reading of applicable statutes or a recitation of all legal elements of each charge" to a grand jury).

Here, the indictment alleged the essential facts of the crimes and the prosecutor's instructions on the applicable law to the grand jury were sufficiently stated. Thus, the judges did not abuse their discretion in denying the motions to dismiss the indictment. Moreover, the jury's verdict, rendered after the judge provided appropriate final jury instructions consistent with the model charge for accomplice liability, represents a finding beyond a reasonable doubt that defendants were guilty of the charged offenses. Thus, even if we agreed the grand jury instructions were erroneous, which we do not, we are satisfied any error was rendered harmless by the subsequent guilty verdict.

We also reject Marcus's argument that the prosecutor committed misconduct by informing the grand jurors about his criminal history. Nothing in the grand jury record reflects the prosecutor even suggested Marcus had a criminal record. Condon merely testified Marcus was known to associate with Gilbert, which explained the plan for Marcus to meet Gilbert to buy drugs. Nor was it prejudicial for Condon to simply state the Neptune Police knew Marcus by his street name, King.

Contrary to Danron's prosecutorial misconduct argument, Condon did not tell the grand jury that Danron was identified as the second person in the crime scene video. Condon accurately testified he understood Danron was the second individual in the crime scene video because Danron was positively identified as the person interacting with Marcus in the convenience store video and Danron's clothing in the convenience store video matched the clothing of the second person in the crime scene video.

We agree that Condon inaccurately told the grand jury the bullet recovered from Gilbert's body matched the gun found in Asbury Park. However, Condon's misstatement was not crucial to the State's charges. The video evidence depicted a person firing a gun in Gilbert's direction, and Condon reasonably identified Danron as the shooter. Additionally, Condon's mistaken testimony was not repeated at trial. Moreover, at trial, Danron's attorney highlighted the State's failure to conduct ballistics testing of the bullet recovered from Gilbert's body. Under the circumstances, Condon's misstatement to the grand jury did not warrant dismissal of the indictment.

We also reject Danron's argument that the prosecutor's referring to the shooting as "the murder" and defendants as "killers" constituted prosecutorial misconduct. These references did not interfere with the grand jury's thorough

44

evaluation of the evidence. Thus, the judges properly denied the motions to dismiss the indictment.

## III.

We next consider Marcus's argument "[t]he State's racially biased peremptory strike of [prospective] juror [number thirteen] violated [his] right to due process and a fair jury." We disagree.

On the first day of jury selection, the judge pre-qualified the prospective jurors and began more substantive questioning. Prospective juror thirteen was pre-qualified to serve as a possible juror.

The next day, the judge questioned prospective juror thirteen in detail. The prospective juror stated she worked selling industrial supplies but previously worked as a paralegal for a criminal defense attorney. Additionally, the judge learned the prospective juror had a master's degree in human resources and a bachelor's degree in criminal justice.

When asked about the criminal justice system, the prospective juror stated: "I think it can be fair sometimes," but she said she also believed "economic status" could have an impact. When questioned about assessing credibility, she responded she used her "gut feeling" as well as "consistency in

the story."  She told the judge she "believe[d] that people can look you in the face and look you in the eye and tell you a boldfaced lie."

After questioning the prospective jurors, the State exercised seven peremptory challenges, including dismissal of prospective juror thirteen. Marcus's attorney objected to the peremptory strike of that prospective juror, arguing the State exercised its challenge based on the juror's race.  At the time, prospective juror thirteen was the only African American juror on the panel.

Citing the new Rule 1:8-3A, the judge asked the prosecutor to explain the reasons for exercising the peremptory challenge as to prospective juror thirteen. The prosecutor stated:

> Yes, Judge. There are several reasons for the State's move to strike Juror Number [Thirteen] for cause. First, the prospective juror has a family member, a brother-in-law, who was convicted and served a [fifteen]-year State Prison sentence for armed robbery, armed robbery being one of the specific charges in this case.  It's not as if he'd done prison time for a car theft or . . . a burglary.  This is an armed robbery, identifying specifically with the charge here.  And there's a concern from the State that that victim would identify with or have sympathy for a defendant with that same charge.
>
> Secondly, Judge, . . . the prospective juror served as a paralegal in a criminal defense firm, a criminal defense firm that may or may not have done business down here in Monmouth County. . . .  There's a concern that there may or may not be . . . an issue . . . with that in terms of . . . negative connotation between law

enforcement here and a criminal defense attorney who does work here.

I would say to you, Judge, also that there is – this issue of a paralegal, someone in the jury room exercising what I'll call an expertise, somebody who would mention or has mentioned to the other prospective jurors that she has a background in criminal law. I think . . . her bachelor's degree is . . . in criminal justice also. I don't want the jurors either to rely more extensively on her background. I don't want her to be more specifically opinionated back there because she has that background and education and also that background and work experience.

Finally, Judge, one of the other prospective jurors, Juror Number [Nine], . . . was a paralegal and the State . . . was inclined to strike her for the same reason. There was . . . a beat to the punch by defense counsel.

So, Judge, the issue here has nothing to do with race, color, anything to that effect. In this case, Judge, the victim is African American, as are the defendants. One of the main witnesses in the case is a family member of the defendants. He's African American.

Race doesn't come into this, Judge. This is a tactical decision . . . based on our take as to that prospective juror's what I'll say disruption or potential disruption in the jury room as I see it.

Marcus's counsel argued Rule 1:8-3A declared the use of a peremptory challenge premised on the criminal conviction of a prospective juror's family member presumptively invalid. Defense counsel also asserted prospective juror

thirteen was the only person of color at the time and relatively younger than other potential jurors.

The judge allowed the State to excuse prospective juror thirteen, stating:

> All right, so I had an opportunity to . . . review the record as to the colloquy with Juror Number [Thirteen]. And ultimately, the State's concerns . . . if you take them individually, . . . there may be a concern by the [c]ourt, but when you take them collectively and you add them together, that's where I do find that under the circumstances that . . . the State had valid reasons . . . to challenge this particular juror.
>
> I find that . . . when you question a juror about a prior incident that may have involved a family member . . . and they indicate that they can be fair and impartial, that it still can be concerning to either side, someone that's been . . . convicted of a crime in the past, they've served [fifteen] years, you know.
>
> You also have to factor in that now this Juror Number [Thirteen] has an idea of what a sentence could be for a conviction . . . for armed robbery, and that could play a role in her ultimate determination. She may not understand what a conviction for murder or felony murder would be, but the fact that she knows that what is a sentencing guideline for at least or what a person can get for an armed robbery could be concerning to . . . the State.
>
> The fact . . . that somebody is committing, allegedly committing, the same crime as is alleged here is something that I can see from the State's perspective that they may have some concerns about.

48

Also, the fact that . . . Juror Number [Thirteen] has worked for a defense attorney who has done work in Monmouth County as a criminal defense attorney for a period of three years and during that time frame obviously was a criminal paralegal that was assisting criminal lawyers in defending clients. So . . . all of those when you put them together, not individually as [defense counsel] has argued them, but if you put them together collectively, I find under these circumstances that it was reasonable . . . for the State to excuse this particular juror and use a peremptory challenge.

I did look at some of the presumptively invalid reasons that are noted, and one is that having a close relationship with people who have been stopped, arrested, or convicted of a crime. . . . I agree with [defense counsel] that in and of itself would be something if that's all [the prosecutor] was saying and . . . the crime had to deal with let's say, I don't know, [an] eluding charge, for an example, then I would have a different opinion here than I do because the crime is similar to what's been alleged here. I think there is a difference there.

I think . . . because of the sentence imposed is a difference here, . . . [and] I find that working for a defense firm . . . which is not noted as a presumptively invalid reason, is a consideration here.

But these are . . . the reasons . . . that have been argued here, I find that there is a valid reason to challenge from the State's perspective, and I'm going to allow the State to exercise the challenge to Number [Thirteen], and we'll put a new Number [Thirteen] in the box.

From the record, it appears other racially diverse individuals were seated as jurors after the dismissal of prospective juror thirteen.  In fact, during his opening statement, Danron's attorney noted the impaneled jury included "[y]oung, older, mixed ethnicities, from different walks of life, New York, locals, it's wonderful."

Our federal and state constitutions prohibit racial discrimination in the use of peremptory challenges.  Flowers v. Mississippi, 588 U.S. 284, 301-03 (2019); Batson v. Kentucky, 476 U.S. 79, 89 (1986); State v. Andujar, 247 N.J. 275, 297-302 (2021); State v. Gilmore, 103 N.J. 508, 529 (1986).

Recently, Rule 1:8-3A was adopted to address the discriminatory use of peremptory challenges.  The new rule became effective on January 1, 2023, the same month as jury selection in this case.

Rule 1:8-3A provides:

> (a) A party may exercise a peremptory challenge for any reason, except that a party shall not use a peremptory challenge to remove a prospective juror based on actual or perceived membership in a group protected under the United States or New Jersey Constitutions or the New Jersey Law Against Discrimination.  This Rule applies in all civil and criminal trials.
>
> (b) Upon the exercise of a peremptory challenge, the court or any party who believes that the challenge may

violate paragraph (a) above may call for review of the challenge pursuant to this Rule.

(c) Any such review shall take place outside the hearing of the jurors.

(d) In the review of a contested peremptory challenge,

1. The party exercising the peremptory challenge shall give the reasons for doing so; and

2. The court shall determine, under the totality of the circumstances, whether a reasonable, fully informed person would find that the challenge violates paragraph (a) of this Rule.

(e) A peremptory challenge violates paragraph (a) of this Rule if a reasonable, fully informed person would believe that a party removed a prospective juror based on the juror's actual or perceived membership in a group protected under that paragraph.

(f) If the court finds that a reasonable, fully informed person would view the contested peremptory challenge to violate paragraph (a) of this Rule, the court shall impose an appropriate remedy. No finding of purposeful discrimination or bias is required.

Rule 1:8-3A "makes explicit State policy reducing bias in the exercise of peremptory challenges" and "eliminates the former practice of requiring that a party objecting to the use of the challenge establish, prima facie, that the challenge was in fact, biased after which the burden shifted to the party challenging the juror to prove that the challenge was not biased." Pressler &

51

Verniero, <u>Current N.J. Court Rules</u> cmt. on <u>R.</u> 1:8-3A (2025). "Consistent with [<u>Rule of Professional Conduct</u>] 3.1, any call for a review of a peremptory challenge should be advanced in good faith." <u>Id.</u> off. cmt. on <u>R.</u> 1:8-3A.

The Official Comment to <u>Rule</u> 1:8-3A explains certain reasons for exercising a peremptory challenge are "presumptively invalid." As relevant here, the Official Comment states:

> In considering the reasons given for a peremptory challenge pursuant to paragraph (d)(1) [of the Rule], the court shall bear in mind that the following reasons have historically been associated with improper discrimination, explicit bias, and implicit bias in jury selection and are therefore presumptively invalid: . . . having a close relationship with people who have been stopped, arrested, or convicted of a crime . . . .
>
> A party exercising a challenge on one of those bases may overcome the presumption of invalidity by demonstrating to the court's satisfaction that the challenge was not exercised in violation of paragraph (a), but rather based on a legitimate concern about "the prospective juror's ability to be fair and impartial in light of particular facts and circumstances at issue in the case."
>
> [<u>Ibid.</u>]

"[T]he Court's official comment specifies a number of actions suggestive of bias, the focus of which is intended to effect real change in eliminating or curbing bias." <u>Id.</u> cmt. on <u>R.</u> 1:8-3A. As adopted, <u>Rule</u> 1:8-3A:

heralds a new post-Andujar approach in which past experiences with the criminal justice system—whether as a crime victim or as a person accused of an offense—do not automatically justify for-cause excusal. Instead, our present revised system disfavors the invocation of traditional stereotypes and relies more upon the individual responses and characteristics of the juror.

[State v. Silvers, 477 N.J. Super. 228, 250 (App. Div. 2023), certif. denied, 256 N.J. 197 (2024).]

Further, the Official Comment to Rule 1:8-3A recites relevant factors to be considered in determining whether a peremptory challenge is exercised in a discriminatory manner. The Comment states:

In making its determination as to a contested peremptory challenge pursuant to paragraph (d)(2), the court should consider circumstances that include, but are not limited to: (i) "the number and types of questions posed to the prospective juror," including whether and how "the party exercising the peremptory challenge[] questioned the prospective juror about the alleged concern; (ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the" challenged juror in comparison to other jurors; (iii) whether other prospective jurors gave similar answers but were not challenged by that party; (iv) whether a reason might be disproportionately associated with a protected group identified in paragraph (a); and (v) "whether the party has used peremptory challenges disproportionately against" members of a protected group as defined in paragraph (a).

[Pressler & Verniero, off. cmt. on R. 1:8-3A.]

Our review of a peremptory challenge is "deferential." <u>State v. Thompson</u>, 224 N.J. 324, 345 (2016). In reviewing a trial court's ruling on an objection to the use of a peremptory challenge, we defer to the court's factual findings, in light of the court's opportunity to see and hear the prospective jurors and counsel and assess their credibility and demeanor. <u>Id.</u> at 344-45. We will not disturb a trial judge's factual findings regarding a peremptory challenge simply because we may have reached a different conclusion. <u>Id.</u> at 345.

Here, the judge followed <u>Rule</u> 1:8-3A. He considered all relevant factors, including those articulated in the Official Comment. Prospective juror thirteen was not challenged solely because she had a family member with a criminal conviction. Rather, the family member's specific conviction involved armed robbery, the same crime charged against defendants in this case. Because she had a family member convicted of armed robbery, who was sentenced to fifteen years in prison for that crime, prospective juror thirteen knew the potential sentencing exposure for armed robbery. Moreover, prospective juror thirteen worked for a criminal defense firm. Based on that employment, the prosecutor reasonably perceived the prospective juror might be biased in favor of criminal defendants.

Nothing in the record suggests the prosecutor questioned prospective juror thirteen differently than other prospective jurors. Nor is there anything in the record indicating the prosecutor used peremptory challenges against other minority jurors or refrained from using peremptory challenges against other potential jurors with backgrounds similar to prospective juror thirteen. See State v. Bey, 129 N.J. 557, 585 (1992). On the contrary, the record supports the impaneling of a racially diverse jury.

On this record, we are satisfied no reasonable, fully informed person would find the prosecutor's peremptory challenge of prospective juror thirteen was racially based. After considering all of prospective juror thirteen's responses to the judge's questions, we discern no error in allowing the State's exercise of a peremptory challenge as to that individual.

IV.

We next consider Danron's argument the judge erred in denying his severance motions because the rulings prevented him from presenting a complete defense.[9] He asserts Marcus would have provided exculpatory

---

[9] Danron filed two motions to sever. The motions were resolved by the same judge.

testimony that Danron was not the masked individual in the crime scene video. We reject this argument.

In his first motion to sever, Danron argued Marcus wished to exonerate him. However, Danron proffered no proposed testimony from Marcus in support of the motion. Nor did Marcus join Danron's first motion.

The judge denied Danron's first severance motion, finding no basis to conclude Marcus would testify on Danron's behalf. Further, the judge stated Danron failed to explain the intended scope of Marcus's testimony and whether it would be exculpatory.

Marcus joined Danron's second motion to sever. In considering the second motion, the judge held an in-camera hearing regarding Marcus's purportedly exculpatory testimony. With his attorney present, Marcus told the judge he would testify on Danron's behalf only if their trials were severed.

The judge then asked Marcus for a summary of his proposed exculpatory testimony. Marcus explained Danron "wasn't present" and "wasn't . . . the person who shot and killed Mr. [Gilbert]." When the judge asked the basis for his knowledge, Marcus stated:

> Well, basically–I know my nephew wasn't there. I mean, I know it wasn't my nephew. Whoever this individual was called me by the name of King, and I know–at that point, whoever this individual was, knew

A-3616-22

who I was.  But as he approached me[,] I didn't know who he was because he had a mask on.  And I knew for a fact it wasn't my nephew, but I knew whoever it was, they knew me, and they knew me as King.  My nephew never called me King.  He always calls me Unc.  I knew for a fact it wasn't my nephew that was wearing the mask that came up and shot and killed Mr. [Gilbert].

The judge then asked Marcus the following questions:

[JUDGE]  So, . . . you're saying . . . that the reason you know it's not your nephew is because the person, the individual, that you don't know who it was because they were wearing a mask, called–

[MARCUS]  Yes.  And . . . at the time of the situation, as the individual got closer, because he was telling me, "King, come here," "King, come here."   So, I said, "No."  I said–so I waved to him.  I said, "You come here."  "You come here."  But then at the same time Mr. [Gilbert]'s door was open, so . . . he was coming downstairs as well, because he was telling me to close the door, and he heard me saying, "No.  You come here."  And I waved the guy to come here.  And as he got closer[,] I see he had a mask on.  So at that point I'm like, well, I don't know who this guy is, so, like, what do you want with me?  What's – what's up?  Is that – you know, is that–is that "N" there?  Is that [n-word] (sic) there?  And at that point right there, like, that's not my nephew.  I knew for a fact it wasn't my nephew.

But like I said, whoever it was, they had seen me there and they obviously knew who I was because they called me by my street name, which was King.

[JUDGE]   So, . . . what was the basis of your knowledge, how did you know that it was not your nephew?  You're saying you know because you were

57

there?  Is that what you're saying?  You were there, present, and you witnessed who this person who was there calling you King, which you knew would not be your nephew?

[MARCUS]  I knew it was not my nephew.  Yes, Your Honor.

[JUDGE]  And just to make sure that I'm clear, I'm assuming I know, but just to make sure, your nephew, you mean Danron?

[MARCUS]  Yes, Your Honor.

[JUDGE]  Anything else that you want to proffer to the [c]ourt that . . . you indicate you would testify?

[MARCUS]  No, Your Honor.

. . . .

[JUDGE]  And you indicated that this person who was calling you by the name King, I just want to make sure my notes are correct, you're saying that was the person who shot Mr. [Gilbert]?

[MARCUS]  Yes, Your Honor.

[JUDGE]  And that is all that you wanted to offer in terms of testimony?

[MARCUS]  Yes, Your Honor.

After considering Marcus's proposed testimony, counsel's arguments, and the surveillance videos, the judge denied the second motion to sever.  She found:

The proffered testimony, although proffered to be exculpatory, this [c]ourt finds lack[s] the weight of credibility that is necessary to rise to the level to justify severance in this case. Again, . . . it was not a detailed proffered testimony. And when considered in light of the weight of the State's case here, and again, the [c]ourt is guided . . . and constrained here by insuring that the [c]ourt here is not weighing necessarily the credibility of each of the potential witnesses in this case of the State, whether the State would find one witness more credible than another, but rather taking the totality of the State's proofs and . . . the weight of the State's case in light of the proffered testimony, the [c]ourt does not find . . . that the proffered testimony is credible in the least. And clearly, the proofs submitted by the State here weigh in that finding.

Defendants raised the denial of severance in their motions for a new trial. The judge hearing the new trial motions rejected the arguments. Regarding Danron's motion for a new trial, the judge found no basis to revisit the pretrial judge's decision. In denying the new trial motion, the judge explained the denial of the severance motions was in accordance with the governing law and based on the pretrial judge's credibility assessment of Marcus's proffered testimony during the in-camera proceeding.

Rule 3:7-7 provides "[t]wo or more defendants may be charged in the same indictment or accusation if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." "Indeed, under those circumstances, a joint trial is 'preferable'

59

because it serves judicial economy, avoids inconsistent verdicts, and allows for a 'more accurate assessment of relative culpability.'" State v. Weaver, 219 N.J. 131, 148 (2014) (quoting State v. Brown, 118 N.J. 595, 605 (1990)).

However, Rule 3:7-7 allows "[r]elief from prejudicial joinder shall be afforded as provided by R. 3:15-2." Rule 3:15-2(b) provides:

> If for any other reason it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses or of defendants in an indictment or accusation the court may order an election or separate trials of counts, grant a severance of defendants, or direct other appropriate relief.

"When considering a motion to sever, a court must balance the potential prejudice to a defendant against the interest in judicial economy." State v. Brown, 170 N.J. 138, 160 (2001). "[T]he quantum of real prejudice is critical in any determination to grant a severance." Brown, 118 N.J. at 605.

Where the motion to sever is "based on the claim that one codefendant will exculpate another if the two are not tried together," State v. Sanchez, 143 N.J. 273, 277 (1996),

> the trial court should sever a joint trial if the court is reasonably certain that (1) the defendant will call his codefendant as a witness in a separate trial; (2) the codefendant, although unwilling to testify at a joint trial, will testify at a separate trial either prior or subsequent to his own trial; and (3) the codefendant's

60

proffered testimony will be credible and substantially exculpatory.

[Id. at 293.]

Regarding the question of credibility,

because severance will increase the risk that a codefendant to be tried first will subsequently commit perjury in an effort to exonerate the accomplice, the trial court confronted with a motion for severance must carefully evaluate a codefendant's conditional offer to testify. Unless the court is persuaded that the reliability and trustworthiness of the proffered testimony significantly outweigh the risk of perjury, severance should be denied. That is, "[c]redibility is for the jury, but the [court] is not required to sever on patent fabrications." Byrd v. [Wainwright], 428 F.2d [1017,] 1021 [(5th Cir. 1970)]; cf. State v. Robinson, 253 N.J. Super. 346, 366-67 (App. Div.[1992]) (upholding denial of defendant's motion for new trial that was based on availability of exculpatory testimony from codefendant, because codefendant's proffered testimony appeared to be fabricated).

[Id. at 292.]

Thus, a court must have a proffer from the codefendant regarding the proposed exculpatory testimony to perform the Sanchez evaluation. See State v. DeRoxtro, 327 N.J. Super. 212, 220-21 (App. Div. 2000). "[I]n assessing whether proffered testimony will be substantially exculpatory for purposes of determining whether to grant severance, a trial court necessarily must evaluate

the proposed testimony in the context of the apparent weight of the State's case." Sanchez, 143 N.J. at 294.

"The decision to sever is within the trial court's discretion, and it will be reversed only if it constitutes an abuse of discretion." Weaver, 219 N.J. at 149. Here, the denial of the severance motion was reasonable because the pretrial judge conducting the in-camera hearing found Marcus's proposed testimony lacked credibility.

Marcus's proffered exculpatory testimony was clearly inconsistent with the video evidence and disregarded the weight of the State's case based on other evidence. The crime scene video showed Marcus knew the identity of the other assailant because Marcus directed the movements of that person in the crime scene video. Further, the pretrial judge explained the two individuals in that video executed a planned and coordinated attack on Gilbert. On these facts, we are convinced the judge properly denied Danron's motions to sever.

V.

We next consider Danron's argument the judge erred in permitting Detective Condon to narrate the surveillance videos by offering lay opinion testimony identifying Danron as the second assailant. To give context to

Danron's argument, we cite extensively to Condon's trial testimony, which began on the fourth day of trial.

During opening statements, the jury heard about the surveillance videos but did not see them. In his opening statement, Danron's attorney vehemently denied Danron appeared in the crime scene video or the neighbor's video of Denise's home.

The jury saw some video evidence before Condon testified. During Davis's testimony, the jury saw a clip from the crime scene video and still photographs from that video. Davis identified the attackers in the crime scene video as "Marcus" and "the other boy."

During Britt's testimony, which also took place before Condon testified, the jury saw clips from the convenience store and crime scene videos. Britt identified Marcus and Danron in the convenience store video. However, Britt recognized only Marcus in the crime scene video.

On the first day of Condon's testimony, the prosecutor asked him to provide an overview of the police investigation of the shooting. Condon told the jury the investigation included obtaining surveillance videos from several locations. Condon gave the jury a brief description of the content of the videos. The videos were not shown to the jury on the first day of Condon's testimony.

A-3616-22

Condon told the jury the corner store video "captured the incident" and showed "defendant . . . walking off . . . in a particular direction." According to Condon, this video led the police to the convenience store across the street from Gilbert's apartment.

Next, Condon explained the convenience store video depicted "a person matching the description from the [corner store] footage walk across the street to the [convenience store], then walk inside the [convenience store]." Condon testified the convenience store video showed "defendant meet[ing] up with another person, who was later identified."

Condon also testified regarding the first aid video. He stated:

> We can see when the defendant was dropped off in front of the store. We can see the car that dropped him off. We can see the car exit. We can see the defendant walking around the–the [camera] area. We can see him leave that and walk toward the [convenience store], across the highway.

The prosecutor then asked Condon to explain the evidentiary value of the convenience store video. Condon responded:

> So, clearly, we have already watched what took place at the [corner store]. We could see the incident take place on the one camera. Based on that footage, when you go and you watch him across the parking lot from that [first aid building] photo, you can see the defendant walk across the street into the [convenience store].

64

Once inside the [convenience store], you can see again, live, in color, him walking around the store. He then meets up with another person who matches the clothing description and physical stature of the person of–the second person who is on the [corner store] footage.

[PROSECUTOR] All right. Can you describe that for me? You said physical stature, clothing description. Describe that for me and for the people in the jury.

[CONDON] Sure. It–it's a thin, five-nine, black male, all in black jogging suit with a white t-shirt that's underneath; you could see up in the color area. And again, along the back, there is about an inch and a half of white t-shirt that is sticking out between–which breaks the–the top to the bottom, so it sticks out at the waistline. The white t-shirt sticks out from that one, too.

[PROSECUTOR] Okay. Anything else regarding or of evidentiary value from that [convenience store] video?

[CONDON] Well, when–so, after the defendant is in the store, you can see him pacing around the store, you know, through various cameras. Clearly, he's–he's not shopping because he never goes to a specific aisle. He never does anything at that first time at the store.

Then, this car pulls up, this Nissan Altima that pulls up and that's when the second person, you know, the–the thinner person in the all-black track suit with the white t-shirt sticking out, that's when he pulls up and enters the store. And that's when the defendant and that person meet up and start to have a conversation.

[PROSECUTOR] Okay.

A-3616-22

[JUDGE] Sergeant, just so that we all understand, when you're–when you're referring to the defendant, who are you talking about?

[CONDON] Marcus Morrisey.

[JUDGE] Okay. Sorry, go ahead.

Condon then resumed his trial testimony. He told the jury the police obtained video from a nearby gas station, which depicted "people walking away from the scene . . . at the appropriate times after this incident takes place."

Next, Condon described the identification procedure the police followed with Britt. Condon testified Britt identified Marcus and Danron in the convenience store video. However, the detective mistakenly testified Britt also identified Marcus and Danron in the crime scene video. Defense counsel did not object.

The prosecutor asked the detective if there was any additional evidence of value obtained from the convenience store video. Condon explained the car in the convenience store video provided further evidence of the crimes. He stated the corner store video depicted "a dark-colored sedan" and showed Marcus exit that car and walk toward Gilbert's apartment. Condon explained the car then left the scene, and "[a]gain, later on, that same sedan is seen on the [convenience store] footage, pulling up and parking in front of that camera that faces the

66

entrance way, on the [highway] side. And again, Danron Morrisey is the one getting out of that car, at that time, as well."

The prosecutor then questioned Condon again regarding Britt's identification of defendants. Defense counsel objected, arguing the testimony was cumulative. However, the judge allowed Condon to answer. The following exchange occurred:

> [PROSECUTOR] Sergeant Condon, you had Detective Britt review the video of [Gilbert's] apartment door, right?
>
> [CONDON] Correct.
>
> [PROSECUTOR] Okay. Two assailants, right?
>
> [CONDON] Correct.
>
> [PROSECUTOR] One is?
>
> [CONDON] Marcus Morrisey.
>
> [PROSECUTOR] Okay. The other assailant is?
>
> [CONDON] Danron Morrisey.
>
> [PROSECUTOR] And how is it that you know that, at this point?
>
> [CONDON] Based on the–based on the footage from [the convenience store] and the [corner store], it's the same two people in the same videos.

Defense counsel did not object.

The prosecutor then asked Condon about the surveillance video obtained from Denise's neighbor. The prosecutor asked what Condon could see from the neighbor's video. Condon explained the neighbor's video "corroborated" the information the police obtained about Marcus moving his belongings into Denise's house because "we were able to see Marcus Morrisey and Samantha Wallace arrive at Denise Morrisey's house. They gathered belongings from the vehicle and carried them inside the residence."

Marcus's counsel objected, arguing Condon mischaracterized the evidence because no identifications were made based on the neighbor's video. After this objection, the judge dismissed the jury for the day.

Marcus's attorney then moved for a mistrial. Danron's counsel joined the motion. One of the errors asserted in support of the request for a mistrial related to Condon's testimony about the neighbor's video. Marcus's attorney claimed Condon inappropriately asserted "[Marcus] appeared on the video footage from . . . [Denise's home] when, in fact . . . there's no identification of that footage." He argued the "footage is from a great distance" and "it would be impossible . . . based upon looking at that footage to . . . definitively identify any actor, including my client." Additionally, Marcus's counsel contended: "Detective Condon's response was not only misleading to the jury but also, . . . it leaves

them with the impression . . . that this thing is all buttoned up . . . for lack of a better phrase."

Marcus's attorney further argued:

> the appropriate way to proceed with that particular line of questioning would have been to play the video for the jurors and let them make the assessment themselves.  But now we have the lead detective, who is, you know, a man of great importance in a criminal case and obviously a person who has got a wealth of experience, unilaterally asserting that there has been a legal identification in my view, which simply has not been done.

Defense counsel asserted there was "no way to fix" the error and requested a mistrial.

The judge found no manifest injustice attributable to Condon's testimony and denied the mistrial motion.  Regarding Condon's identification testimony based on the video evidence, the judge stated:

> What I'm going to do is . . . tomorrow . . . after the direct examination, I'm going to give a limiting charge as to the surveillance videos and the testimony.  All I'm going to say, and I'm more than willing to hear from the prosecutor's office and from the defense, if you want to give me a proposed charge, feel free.  If you want to agree to one, even better.
>
> But I'm going to give a charge to the jury that says that Detective Condon, under the circumstances, did not–he's not making identifications.  He's telling you what he is doing based upon what he is seeing, but

69

there was [sic] no specific identifications that were done by him. You may have heard other identifications. Those, you may consider for–and give it whatever weight you deem appropriate. But as it relates to Detective Condon, he is not going to be able to give any IDs, especially from the Morrisey video or the neighbor across the street.

That's my suggestion on how to deal with this. But I don't find that what happened here is–is not correctable. I think it is correctable. I think that what Detective Condon says with this instruction and I either can do it right first thing in the morning or I can do it at the end of direct. It doesn't matter to me. I allow everyone to give their thoughts on it; that–that we can give a limiting instruction as to what his statements mean as it relates to this surveillance video of Denise Morrisey's neighbor.

So, if anybody wants to be heard on that, you can right now or you can tell me at 8:30 tomorrow morning. But once we talk about it tomorrow morning, I'm going to make the decision one way or another.

The next day, the judge articulated additional reasons for denying the mistrial motion. Thereafter, Condon continued his testimony. The judge did not issue a curative instruction regarding Condon's identification testimony.

On the second day of Condon's testimony, the jury saw the surveillance videos described by Condon during his first day of testimony.[10] Without objection, Condon oriented the jury as to the dates, times, and places of the

---

[10] On appeal, Danron objects only to Condon's testimony on the first trial day.

surveillance videos. Prior to playing the neighbor's video of Denise's home, the prosecutor had Condon clarify for the jury that no identifications could be made from that video in response to defense counsel's objection the previous day.

Later, the following exchange transpired:

> [PROSECUTOR] Now, when we broke yesterday, Detective Sergeant Condon, there was some discussion or testimony from you regarding some video, specifically . . . capturing [Denise's home], right?
>
> [CONDON] Correct.
>
> [PROSECUTOR] And I think the thrust of your testimony was you utilizing positive IDs as to what you believe was seen on the video, right?
>
> [CONDON] Correct.
>
> [PROSECUTOR] But it's fair to say, or it's fair to characterize, that this–that kind of positive ID, facial features, can't be made on that video. The–the distance is simply too far, right?
>
> [CONDON] Correct.

Without objection, Condon also testified about stickers on the dark-colored sedan depicted in several of the surveillance videos. The judge precluded Condon from providing a descriptive summary of the videos shown to the jury on the second day of his testimony.

On the third day of Condon's testimony, Danron's counsel cross-examined the detective about his police report, focusing on the detective's description of the clothing worn by Danron in the convenience store video and the clothing worn by the second assailant in the crime scene video. The judge interrupted the cross-examination and the following exchange occurred:

[JUDGE]  So, you're asking him, when he reviewed the video, at [Gilbert's apartment], that what he documented within his report?

[DANRON'S ATTORNEY]  Exactly.

[JUDGE]  Okay.

[DANRON'S ATTORNEY]  As to the clothing.

[JUDGE]  As to the clothing–

[DANRON'S ATTORNEY]  Of Danron–

[JUDGE]–of the–

[DANRON'S ATTORNEY]–of Danron Morrisey.

[JUDGE]  He didn't identify Danron Morrisey at the scene.

[DANRON'S ATTORNEY]  Oh, I'm sorry.  The person he thought was Danron Morrisey, the second person.

[JUDGE]  Okay.

72

In the new trial motions, defendants objected to the denial of their mistrial motions based on the prosecutor's leading questions and Condon's identification from the surveillance video from Denise's neighbor. The judge denied the motions. He found any prejudice that resulted from the prosecutor's leading questions was cured because the judge sustained defense counsel's objections, the prosecutor re-phrased the questions. Additionally, the judge concluded Condon's erroneous identification of defendants in the neighbor's video did not rise to the level of a manifest injustice because Condon only identified Marcus once and the prosecutor immediately ceased that line of questioning.

We review evidentiary rulings for an abuse of discretion. State v. Watson, 254 N.J. 558, 602 (2023). When there is no objection to the admission of evidence, we review for plain error. R. 2:10-2. Plain error is an error "clearly capable of producing an unjust result." State v. Trinidad, 241 N.J. 425, 445 (2020) (quoting R. 2:10-2). Plain error "is a 'high bar,' State v. Santamaria, 236 N.J. 390, 404 (2019), requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached,' State v. Macon, 57 N.J. 325, 336 (1971)." Trinidad, 241 N.J. at 445.

With respect to mistrial motions, the trial court is afforded discretion in determining whether a mistrial is required, or whether an issue may be addressed through a curative instruction or other remedy. State v. Zadroga, 255 N.J. 114, 133 (2023). We will reverse a decision on a motion for a mistrial only if denial of the motion constitutes an abuse of discretion resulting in a manifest denial of justice. Id. at 131; State v. Smith, 224 N.J. 36, 47 (2016).

"[I]n appeals involving the erroneous admission of improper police officer lay testimony, the nature and extent of the admitted testimony is balanced against the strength of the prosecution's case beyond that testimony in determining whether the court's error requires a new trial." State v. Allen, 254 N.J. 530, 550 (2023).

N.J.R.E. 701 (lay opinions) and N.J.R.E. 602 (personal knowledge) govern testimony regarding video evidence presented by police officers who merely investigated a crime and lacked personal knowledge of the content of the video evidence. In such circumstances, police officers may not provide running narratives or commentary regarding video evidence, may not offer opinions or subjective interpretations regarding the content of such video evidence, and may not offer views on factual issues that are "reasonably disputed." Watson, 254 N.J. at 569, 599-605.

However, police officers are permitted to describe the content of video evidence in the form of objective, factual comments, and may highlight matters of particular interest.  Id. at 569, 602-03.  Officers may also identify things depicted in video evidence that informed further investigative inquiry.  Allen, 254 N.J. at 548.

Witnesses, including police witnesses, may not identify a defendant through video or photographic evidence unless they have personal knowledge.  State v. Sanchez, 247 N.J. 450, 466-69 (2021).  When police witnesses review video evidence as part of their testimony, an officer's use of the word "defendant," "which can be interpreted to imply a defendant's guilt . . . should be avoided in favor of neutral, purely descriptive terminology such as 'the suspect' or 'a person.'"  Singh, 245 N.J. at 18.

A police officer may comment regarding the clothing worn by a suspect in a video provided the officer has independent personal knowledge of that clothing.  In Singh, 245 N.J. at 19-20, the Court found no error in the police officer testifying "as to the similarity between the sneakers he observed on the gas station's surveillance video and the sneakers he observed [the] defendant wearing" at the time of the defendant's apprehension.

Here, defendants did not object to Condon's testimony regarding the video evidence. For the most part, Condon testified in accordance with the case law. He identified the sources of the surveillance videos as the corner store, first aid building, convenience store, gas station, and Denise's neighbor's house. Additionally, Condon provided objective, factual descriptions of actions depicted in the video evidence, specifically Marcus walking in the direction of the convenience store, Marcus meeting with another person inside the convenience store, and people walking away from the crime scene. Further, in accordance with the judge's ruling, Condon did not narrate the videos when played for the jury on day two of his testimony.

We note Condon referred to "defendant" in the surveillance videos, meaning Marcus, and agree that reference was improper. Condon should have employed a neutral term, such as "the suspect," to describe the person depicted in the video evidence.

However, we are satisfied the error was not harmful to Danron and was essentially harmless to Marcus. The error was harmless regarding Marcus because Davis and Britt identified Marcus in the crime scene video. And Marcus never challenged their identification. The error was not harmful to Danron in

76

so far as Condon identified Danron getting out of a car in the convenience store video based on Britt's identification of Danron in that video.

The testimony potentially prejudicial to Danron was limited to placing Danron at the scene of the shooting and at Denise's house that same day. Danron strongly contested these facts presented to the jury through Condon's testimony.

Regarding the crime scene video, Condon clearly misspoke when he testified Britt identified Danron in that video. However, based on our review of the entire record, Condon's brief testimony on this issue was not clearly capable of producing an unjust result. Defense counsel noted Condon's flawed testimony on this issue during closing argument. Additionally, in opening and closing arguments, defense counsel repeatedly disputed the State's contention Danron was the second assailant in the crime scene video. Moreover, in summation, defense counsel asked the jury to consider the video evidence as exculpating rather than inculpating Danron because the videos did not show him at the crime scene. Defense counsel also argued to the jury that Condon erred while testifying and "jumped to a conclusion" that the masked assailant in the crime scene video was Danron "based on a hunch."

Importantly, the prosecutor did not rely upon Condon's mistaken testimony during closing arguments. In his summation, the prosecutor

77

acknowledged there was no identification of Danron in the crime scene video. However, the prosecutor urged the jury to find Danron was the second assailant based upon all the surveillance videos and other trial evidence.

Additionally, in his final instructions, the judge told the jurors they were the judges of the facts, and the facts must be based on the evidence adduced at trial. The judge instructed the jurors to decide the credibility of the witnesses and interpret the video evidence after considering all of the trial evidence.

Regarding Condon's testimony highlighting similarities in the clothing and physical stature of Danron as depicted in the convenience store video and the physical appearance and clothing of the second assailant in the crime scene video, the detective's comments were permissible under Watson. Condon's observations were fair and objective. He described for the jury a thin, black male, about five feet nine inches tall, wearing a black jogging suit with a white t-shirt underneath that hung below the waistline. Condon's testimony did not concern any disputed matters. For the same reasons, Condon's testimony regarding the same black sedan seen in various surveillance videos was proper because the police focused on the sedan during their investigation.

After reviewing the evidence presented to the jury, we reject the argument that Condon's lay opinion identification testimony was sufficiently prejudicial

to constitute plain error. Defense counsel vigorously cross-examined Condon regarding his identification of the second assailant. Moreover, defense counsel contested Condon's identification of the second assailant in opening and closing arguments. Throughout the trial, the identity of the second assailant was clearly disputed. Further, the judge instructed the jurors to decide the facts related to the identification of the second assailant based on their own interpretation of the surveillance videos in combination with the other trial evidence. On this record, we are satisfied the jurors reviewed all of the evidence, including video evidence, during their deliberations and reached their own conclusion as to the identity of the second person in the crime scene video.

In addition to the foregoing, the State's case against Danron was exceptionally strong. The videos were only part of the evidence against Danron. The State presented the following evidence during the trial: Danron's false statements to the police regarding the timing of a visit to his girlfriend the night of the shooting based on the timestamp from the convenience store video; cellphone records; Danron's multiple communications with Marcus before and after the crimes; Danron's admitted interaction with Marcus at the convenience store about twenty minutes before the shooting; Danron's connection to the car

transporting Marcus to and from Gilbert's apartment; and surveillance videos depicting that car at various locations on the night of the shooting.

Nor do we agree Condon's inaccurate testimony indicating Marcus and Danron could be seen in the neighbor's video warrants a new trial. To the extent Condon erred when he identified Marcus and Danron in the neighbor's video, the prosecutor corrected the testimony on the second day of the detective's testimony. The prosecutor had Condon clarify for the jury that the neighbor's video camera was too distant from Denise's house to identify any of the individuals in the video. Under the circumstances, neither a mistrial nor a curative instruction by the judge was required to remedy Condon's mistaken testimony identifying Marcus and Danron in the neighbor's video.

## VI.

We turn to Marcus's argument the judge erred in allowing Davis to testify an unknown person delivered 100 grams of cocaine to Gilbert's apartment on the day of the shooting. Marcus asserts the State's late production of a report containing this information warranted exclusion of the testimony, or, alternatively, a mistrial. We disagree.

On January 24, during jury selection, Marcus's attorney informed the judge the State supplied a one-paragraph report prepared by a MCPO detective

regarding Davis's testimony about the delivery of drugs to the apartment. Defense counsel did not receive this report until January 23.

According to defense counsel, the detective who wrote the report participated in Davis's trial preparation eight days earlier. Based on this timing, defense counsel asserted the State's report should have been provided sooner than January 23. Marcus's attorney argued he lacked sufficient opportunity to confirm or refute Davis's information regarding the drugs delivered to Gilbert's apartment. As an alternative to excluding this testimony, Marcus's attorney requested "a little more time before [Davis] is called, so that we can prepare."

The judge stated discovery had been an issue throughout the litigation. He noted trial was delayed due to late discovery. Additionally, the judge found no reason why the report could not have been reviewed and produced soon after it was written.

Despite these statements, the judge was "not sure . . . how much information . . . [was] new, other than the fact of a different person showing up with more cocaine." The judge ruled it would not be burdensome or time-consuming for defense counsel to explore the issue prior to the State calling Davis as a witness. Accordingly, the judge determined the State could not call Davis prior to January 27, allowing defense counsel several days to prepare for

81

her testimony.  The judge also precluded the State from referring to the 100 grams of cocaine in its opening statement.  Defense counsel did not object to the judge's ruling.

"[T]he purpose of pretrial discovery is to ensure a fair trial."  State ex rel. A.B., 219 N.J. 542, 556 (2014).  "Rule 3:13-3 entitles defendants to broad discovery and imposes an affirmative duty on the State to make timely disclosure of relevant information" on a continuing basis.  Smith, 224 N.J. at 48.

Rule 3:13-3(f), governing the ongoing discovery obligation, provides:

> There shall be a continuing duty to provide discovery pursuant to this rule.  If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, it may order such party to permit the discovery of materials not previously disclosed, grant a continuance or delay during trial, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems appropriate.

A trial judge has wide discretion in addressing the remedy for failure to comply with discovery depending on the circumstances presented.  Smith, 224 N.J. at 50-52.

Here, the record supports the judge's finding the State complied with its continuing discovery obligation despite the slight delay.  Additionally, the

judge's remedy, allowing defense counsel additional time to investigate Davis's new information, was a reasonable remedy.

VII.

We next address defendants' argument they did not receive a fair trial based on the judge's exclusion of questions regarding Wallace's statements to the police in an unrelated domestic dispute. We reject their argument.

Before trial, Marcus moved in limine to cross-examine Wallace regarding her statement to police about a domestic incident in August 2022. Wallace's police statement concerning the domestic dispute occurred about four years after her statement to the police regarding Gilbert's shooting.

In August 2022, Wallace requested police assistance in a domestic dispute. According to defense counsel, Wallace misrepresented her relationship with the man involved in the domestic dispute when she gave a statement to the police. Wallace first told the police the man was the father of her child. Later, Wallace told the responding police officer she and the man involved in the domestic dispute were dating. Counsel argued N.J.R.E. 608 permitted use of Wallace's August 2022 statements during cross-examination because the statements demonstrated Wallace's willingness to lie to the police.

Prior to ruling on the in limine motion, the judge considered the police report of the domestic dispute, Wallace's call to 9-1-1 in August 2022, and the responding officer's body-worn camera footage. The judge denied the motion, stating:

> [B]ased upon what I have observed, I observed an individual who was involved in an alleged domestic violence situation wherein she was upset. She provided information. I didn't find her information to be incredible, out of bounds, . . . in a situation where she was trying to be untruthful to the officers. She was responsive to the officers to the best she could. Again, she was very upset.
>
> . . . .
>
> So, . . . I'm going to deny the defendant's request for an in limine motion on this issue. I'm going to preserve the body-worn camera. I'm going to preserve the 9-1-1 call. I'm going to keep this information. I'm not turning it over to the defense because I . . . do not find it to be discoverable for purposes of this case. It was relevant for me overall . . . to get a better understanding and a viewpoint, but I don't find that the defense has set forth a reasonable basis . . . for a hearing. It does not meet the standard for it.
>
> I'll put all my reasons into a written opinion. . . . But the State is not required to produce Ms. Wallace for a[n N.J.R.E.] 104 hearing. None of this information that is in [the officer's] report would be admissible, or be able to be used under [N.J.R.E.] 608(c) and (d). And you'll have my opinion by tomorrow by lunchtime the latest.

But again, I'm going to preserve everything so if defendant ever needs it for purposes of an appeal, the Appellate Division would be able to get it from this [c]ourt, and I will preserve that for the record purposes.

I'm going to mark it on my copy as C-1 and C-2. C-1 is the body-worn camera. C-2 is the 9-1-1 call. . . . So, I will secure that, and I will get an order.

Our review of the judge's in limine ruling is hampered by Marcus's failure to comply with Rule 2:6-1(a)(1). The record on appeal does not include a copy of the judge's written opinion and order. Nor did Marcus include the documents marked C-1 or C-2. Thus, we could decline to address the issue. State v. D.F.W., 468 N.J. Super. 422, 447 (App. Div. 2021).

Nonetheless, we elect to address the issue based on the record before us. N.J.R.E. 608(c) provides extrinsic evidence is generally "not admissible to prove specific instances of a witness' conduct in order to attack or support the witness' character for truthfulness." However, in criminal cases, "the court may, on cross-examination, permit inquiry into specific instances of conduct that are probative of the character for truthfulness or untruthfulness of [a] witness." N.J.R.E. 608(c).

Under N.J.R.E. 608(d):

The proponent of the specific conduct inquiry pursuant to paragraph (c) of this Rule must show that

(1) a reasonable factual basis exists that the specific instance of conduct occurred, and

(2) the specific instance of conduct has probative value in assessing the witness' character for truthfulness.

Under N.J.R.E. 608(e), "the court's determination to allow inquiry under paragraph (c) of this Rule is subject to the balancing standard of Rule 403."

Based on the judge's oral decision on the in limine motion, we discern he concluded there was no "reasonable factual basis" to support defendants' claim that Wallace made intentionally false statements to the police in August 2022. Further, the judge implicitly found the incident lacked probative value in assessing Wallace's character for truthfulness.

We review a trial evidentiary ruling for an abuse of discretion and will reverse only upon a showing of a clear error of judgment resulting in a manifest denial of justice. Burney, 255 N.J. at 20; Singh, 245 N.J. at 12-13. Marcus failed to meet his burden under N.J.R.E. 608 to allow questioning of Wallace regarding her August 2022 statement to the police. The proposed cross-examination of ambiguous statements Wallace made to the police while distressed as a result of a domestic situation did not satisfy the requirements under N.J.R.E. 608. Thus, we discern no abuse of discretion in the judge's preclusion of cross-examination on the proffered testimony.

86

VIII.

We next address an issue raised for the first time on appeal by Danron. He contends the jury instruction on accomplice liability led the jurors to believe that if they found Marcus guilty, they "would [have] had no choice but to find [him] guilty as well." Additionally, Danron argues there was insufficient evidence for the jury to find him guilty of any of the charges. Based on these contentions, Danron asserts the judge erred in denying his motion "to reverse the order denying the dismissal of indictment, and reverse the conviction."

Danron did not raise this issue before the trial judge. Consequently, we review for plain error. R. 2:10-2. On this record, we discern no error, let alone plain error, in the issuance of the accomplice liability charge warranting a judgment of acquittal.

The judge's instruction on accomplice liability was accurate and consistent with the model charge, Model Jury Charges (Criminal), "Liability for Another's Conduct (N.J.S.A. 2C:2-6), Accomplice" (rev. June 7, 2021). Futher, multiple times during his final charge to the jury, the judge expressly instructed the jurors to consider each defendant individually. We presume the jury followed the judge's instructions. State v. Burns, 192 N.J. 312, 335 (2007).

Based on the testimony and proofs adduced at trial, including the reasonable inferences drawn from that information, there was ample evidence for the jury to convict Danron of the crimes as Marcus's accomplice. The evidence presented permitted the jury to infer the second assailant in the crime scene video was Danron. The video evidence showed the second assailant possessed a gun and other evidence indicated Danron lacked a license to possess a gun. The crime scene video demonstrated the second assailant, in conjunction with Marcus, physically assaulted Gilbert. The same video showed the second assailant shot Gilbert and caused his death. Further, because Marcus went to Gilbert's apartment to buy drugs and the police found no drugs or money on Gilbert after the shooting, the jury could reasonably infer Danron and Marcus robbed Gilbert. On this evidence, we are satisfied the judge properly rejected Danron's motion for judgment of acquittal. R. 3:18-1; State v. Reyes, 50 N.J. 454, 458-59 (1967).

## IX.

Danron asserts the judge erred in denying his motion for a new trial, repeating many of the same arguments on appeal. We previously explained our reasons for rejecting Danron's arguments regarding the following issues: (1) the judge's denial of the motions to sever the trial; (2) the judge's denial of a mistrial

motion based on Condon's identification testimony; and (3) the judge's preclusion of the gun photograph found on Gilbert's cellphone. We need not repeat our reasons rejecting Danron's arguments for a new trial premised on these same arguments.

However, Danron proffers an additional argument in support of his request for a new trial. Danron argues the verdict was against the weight of the evidence because the State failed to present evidence proving he participated in the attack on Gilbert. We reject his argument.

Rule 3:20-1 provides:

> The trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice. . . . The trial judge shall not, however, set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law.

"The decision of whether to grant or deny a motion for a new trial is left to the trial judge's sound discretion." State v. Van Ness, 450 N.J. Super. 470, 495 (App. Div. 2017). In the exercise of that discretion, we defer "to the trial judge's feel for the case and observation of witnesses." State v. Terrell, 452 N.J. Super. 226, 268-69 (App. Div. 2016).

We will not reverse a trial judge's ruling on a motion for a new trial based upon a weight-of-the-evidence argument "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1; State v. Jackson, 211 N.J. 394, 413 (2012). "[A] reviewing court should not overturn the findings of a jury merely because the court might have found otherwise if faced with the same evidence." State v. Afanador, 134 N.J. 162, 178 (1993).

The judge rejected Danron's against-the-weight-of-the-evidence argument in support of a new trial. The judge found the trial evidence sufficient to convict both defendants. Regarding Danron's specific argument he could not be identified as the second individual in the crime scene videos, the judge concluded:

> The State produced video surveillance of the incident where . . . Marcus . . . is depicted with another who ultimately fires gunshots in [Gilbert]'s direction. This individual, while hooded, is depicted wearing clothing identical[8] to the clothing . . . Danron . . . is depicted wearing in surveillance footage from a nearby . . . convenience store before the incident.[9] Further, as previously explained, in the video of the incident, . . . Marcus . . . is depicted apparently working in conjunction with the hooded individual waving to the hooded individual who in response, appears within the surveillance video frame thereafter. Finally, the State produced phone records between the two [d]efendants, demonstrating contacts made before and after the incident.

8 In addition to the clothing being the same, witnesses attested to the fact that in both videos, a white t-shirt is seen hanging out of the bottom of the hoodie.

9 The State elicited testimony from a family member of . . . Danron . . . identifying him in the latter video.

Having reviewed the record, we are satisfied the judge's decision rejecting the new trial motion is supported by the trial evidence. We discern no miscarriage of justice in the judge's denial of the motion. After considering the evidence adduced at trial, the jury found Danron was the second assailant in the crime scene video and he participated with Marcus in the robbing and shooting of Gilbert. We will not second-guess the jury's determination.

## X.

We next consider Danron's arguments regarding the sentence imposed. Danron argues his "sentence of fifty-five years subject to [NERA] is manifestly excessive and the conviction for felony murder must be merged." Regarding the issue of merger, Danron contends the felony murder conviction must be merged with the murder conviction, and the robbery conviction must be unmerged from the felony murder conviction. Regarding the length of the sentence imposed, he claims the judge erred in finding aggravating factor one, N.J.S.A. 2C:44-1(a)(1),

nature and circumstances of the offense, and aggravating factor three, N.J.S.A. 2C:44-1(a)(3), risk of re-offense.

The State concedes the case must be remanded for sentencing purposes to merge the felony murder conviction with the murder conviction and to unmerge the robbery conviction. However, the State argues the judge appropriately sentenced Danron.

Because we are convinced by the parties' agreement on Danron's merger arguments, we remand to the sentencing judge limited to correcting the merger errors in the sentence and issuing an amended JOC. However, we reject Danron's arguments regarding the imposed sentence.

At sentencing, the judge found Danron was influenced by Marcus but Danron was twenty-six years old at the time of the crimes. Further, the judge determined Danron fully participated in the criminal conduct, met with Marcus prior to committing the crimes, arranged for his friend, Sloan, to drive the getaway car, arrived at the crime scene masked and with a gun, and made his own decision to shoot Gilbert. The judge also considered Danron's criminal history and the failure of the punishments imposed for Danron's prior crimes to deter him from the present crimes. Additionally, the judge considered Danron's limited substance abuse history, work history, and impending fatherhood.

The judge found aggravating factor one applied and assigned that factor "some weight" because of the effect the crimes had on Davis. The judge also found aggravating factor three applied and assigned the factor "some weight" based on Danron's failure to be deterred by past punishments, contrived expression of remorse without "really accept[ing] and understand[ing] the true magnitude of his behavior," and participation in a jailhouse riot while awaiting sentencing.

The judge found only mitigating factor thirteen, N.J.S.A. 2C:44-1(b)(13), (conduct of a youthful defendant was influenced by another person more mature) applied. The judge found this mitigating factor because Danron's conduct was substantially influenced by Marcus. However, the judge gave this mitigating factor "very limited weight." Overall, the judge concluded the aggravating factors substantially outweighed the one mitigating factor.

The judge then sentenced Danron to fifty-five years on the murder conviction (count one), subject to NERA, N.J.S.A. 2C:43-6(c), intending Danron would "serve the rest of his life in jail." On the robbery conviction (count two), the judge sentenced Danron to eighteen years, subject to NERA. On the felony murder conviction (count three), the judge sentenced Danron to fifty-five years, subject to NERA. On the unlawful possession of a weapon

conviction (count four), the judge sentenced Danron to nine years with a four-and-one-half-year period of parole ineligibility.  Lastly, on the conviction of possession of a weapon for an unlawful purpose (count five), the judge sentenced Danron to nine years with a four-and-one-half-year period of parole ineligibility, subject to the Graves Act, N.J.S.A. 2C:43-6c.

The judge declined to impose consecutive sentences, finding "this entire incident was all a part of one single act that happened extremely quickly in time," "[t]here was a single victim here," and the sentence imposed was "a significant amount of time" and "a fair sentence" that did not need to be extended.

The judge merged the armed robbery conviction (count two) into the felony murder conviction (count three).  Additionally, the judge imposed the sentences on counts one, four, and five concurrently to the sentence on count three.

In imposing a sentence, the sentencing judge must identify the relevant aggravating and mitigating factors, weigh and balance them, and determine the appropriate sentence within the range specified by the Legislature.  State v. Case, 220 N.J. 49, 63-65 (2014).  "Appellate review of sentencing is deferential,

and appellate courts are cautioned not to substitute their judgment for those of our sentencing courts." Id. at 65.

We review sentencing decisions for abuse of discretion. State v. R.Y., 242 N.J. 48, 73 (2020); State v. Miller, 237 N.J. 15, 28 (2019). Where the sentencing judge imposed a sentence within the statutory guidelines, and the judge's findings on the aggravating and mitigating factors are supported by competent, credible evidence in the record and properly balanced, we will affirm the sentence unless it shocks the conscience. State v. Rivera, 249 N.J. 285, 297-98 (2021).

Danron's reliance on State v. Marks, 201 N.J. Super. 514, 539-40 (App. Div. 1985), for the proposition that "[a] court cannot use a defendant's refusal to admit guilt as an aggravating factor," is misplaced. Consistent with our case law, a defendant's lack of remorse is relevant to a sentencing court's findings on aggravating factor three. See State v. O'Donnell, 117 N.J. 210, 216 (1989); State v. Morente-Dubon, 474 N.J. Super. 197, 214 (App. Div. 2022).

As for the merger issues, the parties agree the judge made a misstep in failing to merge the felony murder conviction into the murder conviction and merging the robbery conviction into the felony murder conviction. State v. Brown, 138 N.J. 481, 560-61 (1994); State v. Bellamy, 468 N.J. Super. 29, 41

(App. Div. 2021). Therefore, we are constrained to remand limited to the judge's issuance of an amended JOC correcting the merger issues.

However, we otherwise affirm the sentence as to Danron. Based on the record, we are satisfied the judge properly evaluated the facts and correctly applied the aggravating and mitigating factors in sentencing Danron.

## XI.

On appeal, Marcus raises the same argument as Danron regarding the merger issue. Additionally, Marcus contends the life sentence imposed is excessive because it is longer than the sixty-seven-year prior term requested by the State. He also claims the sentencing judge penalized him for exercising his constitutional rights to remain silent and to a jury trial.

In a supplemental counsel-filed brief, Marcus also argues that "[t]he persistent-offender extended-term imposed under N.J.S.A. 2C:44-3(a) is illegal and unconstitutional and must be vacated." Marcus asserts Erlinger v. United States, 602 U.S. 821 (2024), and State v. Carlton, 480 N.J. Super. 311 (App. Div. 2024), afford him the constitutional right to a jury trial on the question of whether he is eligible for enhanced punishment as a persistent offender.

The State concedes the error in failing to merge Marcus's felony murder and murder convictions. However, the State contends the life sentence is fair and does not punish Marcus for exercising his constitutional rights.

At Marcus's sentencing hearing, the State asked the judge to merge the murder and felony murder convictions. Additionally, the State requested the judge sentence Marcus consecutively on the robbery conviction. Regarding the aggravating factors, the State argued for aggravating factors one, two, N.J.S.A. 2C:44-1(a)(2) (gravity of harm), three, six, N.J.S.A. 2C:44-1(a)(6) (prior criminal record), and nine, N.J.S.A. 2C:44-1(a)(9)(need for deterrence), applied and there were no mitigating factors based upon the nature of the crime and Marcus's lengthy criminal history. The State asked the judge to impose a sixty-seven-year sentence, subject to NERA. While the State requested an extended-term sentence in its sentencing brief, the State did not raise the issue during the sentencing argument.

At sentencing, Marcus's attorney highlighted the following facts: Marcus's troubled youth; the undisputed fact Marcus did not pull the trigger causing Gilbert's death; Marcus's positive relationships with his children; the family hardship resulting from a long prison term; and Marcus's personal growth and character, such that he was unlikely to commit another offense. Marcus's

A-3616-22

counsel requested the judge find mitigating factors nine, N.J.S.A. 2C:44-1(b)(9) (unlikely to commit another offense) and eleven, N.J.S.A. 2C:44-1(b)(11), (excessive hardship, applicable). Marcus's attorney requested the minimum possible sentence of thirty years, with the sentences on each count imposed concurrently.

Before imposing sentence, the judge asked if Marcus wanted to speak. After Marcus declined, the judge said, "Okay. That helps me with mitigating factor number [nine]." On appeal, Marcus argues the judge penalized him for asserting his right to remain silent.

In his sentencing decision, the judge found Marcus was "the mastermind" of "a robbery gone bad" that led to Gilbert's murder. He also found Marcus and Danron "work[ed] in concert" and Marcus "put everything in motion."

The judge considered Marcus's persistent abuse of substances, sporadic work history, extensive criminal history, and the nature and circumstances of the crimes. The judge found aggravating factor one applied and gave it "some weight" based on the impact the crimes had on Davis. The judge also found aggravating factors three, six, and nine applied and gave "significant weight" to those factors based on defendant's criminal history and failure to respond to rehabilitation. Additionally, the judge found no mitigating factors applied. The

judge explained the mitigating factors requested by Marcus were unsupported by the record. Overall, the judge found the aggravating factors substantially outweighed the non-existent mitigating factors.

Regarding aggravating factor nine, the judge said:

> Under State [v.] Rivers, 252 N.J. Super. 142, 153-154 (App[.] Div[.] 1991), aggravating factor number [nine] exists when the defendant is a persistent offender and in court–when you look at this defendant's in-court[] denial and today, I got nothing to say, is to me a disgrace. This defendant can sit here today and maybe want to say I didn't pull the trigger, but he can't sit here and say that he wasn't there. He can't sit here and say that he wasn't involved. He can't sit here and say that his phone wasn't–he wasn't using his phone at the time to make sure that everything was being facilitated. It's all right in front of us. So, to sit here and to say they have nothing to say under these circumstances allows this [c]ourt to say that there is both a general and . . . specific deterrent for this defendant.
>
> This defendant needs to be specifically deterred because there is nothing going to stop this defendant moving forward. Nothing. It hasn't worked in the past. Jail sentences haven't worked in the past. Parole hasn't worked in the past. Probation hasn't worked in the past.
>
> Nothing has worked. His . . . crime has gotten worse. The violence involved in this case is the most severe that you could possibly have when you ultimately are involved with guns, stun guns, and using them in a way that ultimately took a life. So, there is a general and specific deterrent under these

circumstances to protect society, and I give this significant weight.

In rejecting mitigating factor nine, the judge stated:

> The defense has asked . . . me to consider mitigating factor number [nine] . . . that this defendant was good on pretrial release, that he showed up for court every day–well, he was good on pretrial release, but he did have an issue or two in this [c]ourt's opinion because I was involved. So, he wasn't totally good. He did show up for court every day . . . and he was respectful. He sat in court, but isn't that what[] . . . everyone's supposed to do? Isn't that what life is supposed to be? That you're supposed to respect something? So, . . . I'll give him credit for showing up. I'll give him credit for the fact that he could've ran after hearing the arguments. And while [defense counsel] did a tremendous job under the circumstances in trying to show the jury a different side of this case, at the end of the day, Marcus was going to go down, and he did.
>
> He showed up. I'll give him the fact that he showed up, but that doesn't rise to the level of mitigating factor number [nine]. And because I also found aggravating factor number [three], I do not give him mitigating factor number [nine]. And I also don't give it to him because he has zero remorse for anything that he has done.

Regarding the ultimate sentence, the judge determined Marcus's crimes warranted a longer sentence than Danron's based on Marcus's criminal history and role in planning the crimes against Gilbert. The judge sentenced Marcus as follows: (1) life in prison on the murder conviction (count one), subject to NERA

and the Graves Act, "which is [seventy-five] years statutorily," with defendant required to "serve [sixty-three] years, [nine] months, and [three] days before he will be eligible for parole"; (2) twenty years on the armed robbery conviction (count two), subject to NERA; (3) a life term on the felony murder conviction (count three), subject to NERA and the Graves Act; (4) ten years on the conviction for unlawful possession of a weapon (the handgun) (count four), subject to five years of parole ineligibility under the Graves Act; (5) ten years on the conviction for possession of a weapon (the handgun) for an unlawful purpose, (count five), subject to the Graves Act; (6) eighteen months on the conviction for possession of a prohibited weapon (the stun gun) (count six); and (7) five years on the conviction for possession of a weapon (the stun gun) for an unlawful purpose (count seven).

The judge rejected the State's request for consecutive sentences. Instead, the judge imposed concurrent sentences, finding the matter involved "a single event," a robbery that "went bad," and consecutive sentences were "not necessary" because the life sentence imposed on the murder charges was sufficient to ensure Marcus would spend the rest of his life in prison.

While the judge did not merge the convictions for murder (count one) and felony murder (count three), the judge merged the robbery conviction (count

101

two) into the felony murder conviction (count three), the conviction for possession of handgun for an unlawful purpose (count five) into the felony murder conviction (count three), and the conviction for unlawful possession of a stun gun (count six) into the conviction for possession of a stun gun for an unlawful purpose (count seven).  Additionally, the judge ruled the sentences for murder (count one), unlawful possession of a handgun (count four), and possession of a stun gun for an unlawful purpose (count seven) would run concurrent to the sentence for felony murder (count three).

Regarding the State's request for a discretionary extended term based upon Marcus's status as a persistent offender, the judge found that the statutory requirements for such an extended-term sentence were satisfied.  Although the judge stated he was "granting the State's motion for . . . [a] discretionary extended term," the judge concluded an extended term was unnecessary because the sentence imposed, within the permitted range of thirty years to life, was "substantial" and "fit[] the crime . . . committed by this defendant."  The judge further stated: "So, while I am granting the motion, I am just giving . . . the maximum sentence toward this particular charge of the felony murder, and that's how I come to the conclusion that it's a life[-]in[-]prison sentence."  The judge explained he was "granting the extended term; however, [he was] not going

beyond . . . the life sentence because . . . the sentence is appropriate enough under the circumstances."

We previously addressed the standard of review and legal principles governing sentencing in addressing Danron's sentencing arguments. We need not repeat them in reviewing Marcus's sentencing arguments.

The parties agree the judge made a misstep in declining to merge the felony murder conviction (count three) with the murder conviction (count one). Additionally, as a result of the foregoing merger, the State argues the judge should unmerge the convictions for possession of a weapon for an unlawful purpose (count five) and robbery (count two) from the conviction for felony murder (count three). Thus, we are constrained to remand to the sentencing judge limited to correcting the merger errors and issuing amended JOCs.

Regarding the length of Marcus's sentence, the judge imposed a life sentence, which by statute is considered seventy-five years, N.J.S.A. 2C:43-7.2(b). The imposed sentence was slightly longer than the sixty-seven years requested by the State. However, the maximum sentence imposed was supported by the judge's detailed findings regarding the aggravating and mitigating factors.

103

Contrary to Marcus's argument, the judge did not penalize him for exercising his constitutional rights to remain silent and to a trial by jury. The judge noted the video evidence captured Marcus committing the crimes of which he was convicted. The judge further found Marcus's offenses in this case represented an escalation of violence and indicated he was not deterred by past punishments.

Regarding Marcus's arguments concerning an extended-term sentence, there is no need to vacate and remand for resentencing. Although the judge stated he was granting the State's motion for an extended term, the judge did not actually grant the motion. Rather, the judge expressly declined to impose an extended-term sentence and imposed the ordinary, maximum term for each offense.

Having reviewed the record, we are satisfied the judge did not abuse his discretion in sentencing Marcus. The judge considered and applied the relevant aggravating factors and explained his reasons for rejecting the requested mitigating factors.

For the foregoing reasons, we are constrained to remand limited to the judge's correction of the merger issues and issuance of an amended JOC. We otherwise affirm the sentence as to Marcus.

A-3616-22

To the extent we have not expressly addressed any of defendants' remaining arguments, they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed as to defendants' convictions and sentences, but remanded limited to the correction of the merger issues with the entry of amended JOCs in accordance with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-3616-22